JUDGE MARRERO



**THE ROSEN LAW FIRM, P.A.**
Jonathan Horne, Esq. (JH-7258)
Phillip Kim, Esq. (PK-9384)
Laurence M. Rosen, Esq. (LR-5733)
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: jhorne@rosenlegal.com
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com

Counsel or Plaintiffs

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ADAM OLIVEIRA, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>HOME LOAN SERVICING SOLUTIONS, LTD., WILLIAM C. ERBEY, JOHN P. VAN VLACK, AND, JAMES E. LAUTER<br><br>　　　　　Defendants. | CASE No.:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

　　　　Plaintiff Adam Oliveira, individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Home Loan Servicing Solutions, Ltd. ("HLSS" or the "Company"), as well as

1

media reports about the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased HLSS securities between February 7, 2013 and January 23, 2015, inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 against the Company and certain of its officers and directors.

## JURISDICTION AND VENUE

2.    Jurisdiction is conferred by §27 of the Exchange Act. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

3.    Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) as the Company conducts business in this district.

4.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

5.     Plaintiff Adam Oliveira, as set forth in the attached certification, purchased HLSS securities at artificially inflated prices during the Class Period and has been damaged upon the revelation of the alleged corrective disclosures.

6.     Defendant HLSS is headquartered and incorporated in the Cayman Islands. The common stock is traded on NASDAQ under the ticker symbol "HLSS."

7.     Defendant William C. Erbey ("Erbey") was the Chairman of the Board of Directors ("Chairman") at HLSS until his resignation took effect on January 16, 2015. During the Class Period, he also served as Chairman of the Board of the Directors for Ocwen.

8.     Defendants John P. Van Vlack ("Van Vlack") is the Company's Chief Executive Officer ("CEO")

9.     Defendant James E. Lauter ("Lauter") is the Company's Chief Financial Officer ("CFO") and Chief Accounting Officer.

10.     Defendants HLSS, Erbey, Van Vlack, and Lauter are collectively referred to herein as "Defendants."

11.     The Defendants Erbey, Van Vlack, and Lauter are collectively referred to herein as the "Individual Defendants."

## DEFENDANTS' WRONGDOING

### Background

12.     HLSS acquires mortgage servicing assets from Ocwen Financial Corporation ("Ocwen"), as residential mortgage loan servicer. HLSS's mortgage servicing assets are servicing advances, mortgage servicing rights, rights to mortgage servicing rights, and other related assets.

3

13.     Ocwen is a financial services holding company that engages in servicing and originating forward and reverse mortgage loans. Ocwen's servicing segment provides residential and commercial mortgage loan servicing, special servicing, and asset management services to owners of mortgage loans and foreclosed real estate. Ocwen's servicing segment's residential servicing portfolio includes conventional, government insured, and non-agency loans, such as subprime loans. Ocwen's lending segment is involved in involved in originating and purchasing conventional and government insured residential forward, and reverse mortgage loans primarily through its correspondent lending arrangements, as well as offers direct lending services.

14.     HLSS depends upon Ocwen for its survival. HLSS's primary source of income is the interest income on notes receivable. The interest income is the servicing fees collected by Ocwen on underlying mortgage servicing rights less amounts due to Ocwen for its services under the purchase agreement with Ocwen and the amount or amortization of the Notes receivable.

15.     The rights to mortgage servicing assets that HLSS has acquired are all serviced by Ocwen. HLSS's success is based on Ocwen's business because HLSS derives its revenue from Ocwen.

16.     HLSS and Ocwen each had the same Director and Chairman, Defendant Erbey, until his resignation went into effect on January 16, 2015.

17.     Not only was Defendant Erbey Chairman of HLSS and Ocwen, he was also the control person and largest individual shareholder of them.

18.     The New York Department of Financial Services ("NY DFS") began investigating Ocwen in 2011 for violations of New York State laws and regulations.

19.     Ocwen and NY DFS entered into an Agreement on Mortgage Servicing Practices on September 1, 2011. When Ocwen violated this 2011 Agreement, Ocwen entered into a Consent

Order with NY DFS on December 5, 2012. That Consent Order required Ocwen to retain an independent compliance monitor for two years to conduct a comprehensive review of Ocwen's servicing operations.

20.     To resolve the wrongdoings and illegal conduct the NY DFS found at Ocwen, Ocwen entered into a Consent Order and settlement with the NY DFS on December 22, 2014 to resolve *In the Matter of Ocwen Financial Corporation, Ocwen Loan Servicing, LLC.*

21.     As a condition of a settlement with the NY DFS and Ocwen, Defendant Erbey was required to resign as Chairman for HLSS, Ocwen, and other companies in which he served in that position.

22.     Ocwen and its management, including Defendant Erbey, were aware of NY DFS's investigation since 2011. Considering the overlap in management and HLSS's dependence on Ocwen, it is impossible that Defendants were unaware of NY DFS's investigation of Ocwen and the severity of the illegal actions in which it was engaged.

23.     The release of the Consent Order in December 2014 harmed HLSS shareholders.

24.     Furthermore, Defendants must have been aware that the California Department of Business Oversight ("DBO"), had been in the process of determining whether to revoke Ocwen's mortgage servicing license since October 2014.

25.     On January 23, 2015, the DBO entered into a settlement with Ocwen to end the process of suspending Ocwen's mortgage license. The terms of the settlement were that the DBO would cease its effort to suspend Ocwen's mortgage license in exchange for $2.5 million from Ocwen. Additionally, Ocwen would be prohibited from engaging new California customers until the DBO determines it is in compliance with state laws like the California Residential Mortgage Lending Act and the 2012 Homeowner Bill of Rights. The DBO maintains the right to pursue

enforcement against Ocwen if after an audit of the loan files reveals violation so the California laws.

26.      On January 23, 2015 BlueMountain Capital Management, LLC ("BlueMountain"), a hedge fund, sent HLSS and Ocwen a notice of default on certain Series 2012-T2 and Series 2013-T3 Notes issued in connection with HLSS Servicer Advance Receivables Trust ("HSART Trust"). Due to Ocwen's violation of laws and regulations, HLSS was in breach of provisions of the Indenture and Master Subservicing Agreement ("Agreement") dated February 10, 2012. It was therefore also in breach of provisions in the Sixth Amended and Restated Indenture dated January 17, 2014.

27.      There is a securities class action currently pending against Ocwen, Defendant Erbey and other directors of Ocwen in the U.S. District Court, Southern District of Florida.

**Defendants Make Materially False Statements**

28.      On February 7, 2013 the Company filed its Form 10-K with the SEC for the year ending December 31, 2012. All of the Individual Defendants signed the 2012 10-K. The 10-K was incomplete as it failed to (i) adequately inform investors that HLSS's business was dependent on Ocwen and Ocwen conducting its business legally; (ii) disclose material risks and uncertainties of HLSS's business due to the systemic internal control weaknesses at Ocwen; (iii) disclose that Ocwen was under investigation for violating applicable federal and state regulations and laws, including among other things, the NY DFS's and California State investigation of Ocwen; (iv) disclose that HLSS was in breach of provisions of its notes with BlueMountain which harmed investors; and (v) disclose the material risks to the Company if it defaults on its notes.

6

29.   On February 6, 2014, the Company filed its Form 10-K with the SEC for the year ending December 31, 2013. All of the Individual Defendants signed the 2013 10-K. The 2013 10-K reiterated statements made in the 2012 10-K. Again, the 10-K was incomplete for the same reasons the 2012 10-K was inadequate.

30.   Defendants knew that Ocwen was violating laws and regulations relating to foreclosure governance, implementation of modification programs, record keeping, required notifications, and charging unallowable fees but never disclosed this to investors.

31.   Ocwen's lack of adherence to regulations severally damaged its business which, because of the relationship between the companies, adversely affected HLSS shareholders.

32.   HLSS also knew that it was not in compliance with the terms of the notes with BlueMountain. These breaches adversely affect HLSS shareholders.

33.   Based on the corporate structure, relationships, and overlapping Chairman of HLSS and Ocwen, Defendants were aware that Ocwen was engaged in illegal conduct. Although Defendants knew of Ocwen's illegal conduct and that it derived substantial, if not all, of its revenue from Ocwen, Defendants did not adequately inform investors of Ocwen's internal control weaknesses.

## THE TRUTH MATERIALIZES CAUSING PLAINTIFF'S LOSSES

34.   On December 22, 2014 Ocwen issued a press release entitled "Ocwen Financial Agrees to Settlement With New York Dept. of Financial Services." The press release details how the NY DFS's investigation of Ocwen was settled by a Consent Order. The press release states in relevant part:

7

ATLANTA, Dec. 22, 2014 (GLOBE NEWSWIRE) -- **Ocwen Financial Corporation** (OCWEN) ("Ocwen") today announced that it has reached a comprehensive settlement with the New York Department of Financial Services ("DFS") related to the agency's recent investigation.

"We are pleased to have reached a comprehensive settlement with the DFS and will act promptly to comply with the terms," said CEO Ronald Faris. "We believe this agreement is in the best interests of our shareholders, employees, borrowers and mortgage investors. We will continue to cooperate with the DFS in the implementation of the terms of this settlement which we believe will allow Ocwen to continue to focus on what we do best -- helping homeowners."

**Under the terms of the settlement, Ocwen will pay a civil monetary penalty of $100 million to the DFS by December 31, 2014, which will be used by the State of New York for housing, foreclosure relief and community redevelopment programs. The Company will also pay $50 million as restitution to current and former New York borrowers who had foreclosure actions filed against them by Ocwen between January 2009 and December 19, 2014.** As previously communicated in the third quarter of 2014, Ocwen recorded a charge of $100 million to increase its legal reserves in anticipation of a potential settlement with the DFS. Ocwen will record an additional $50 million charge in its fourth quarter 2014 financial statements to reflect the final settlement amount.

After nearly 30 years of distinguished service, and **as part of the settlement, founder William C. Erbey will step down from his position as Executive Chairman of Ocwen, effective January 16, 2015.** Barry Wish, a current director of Ocwen, will assume the role of Non-Executive Chairman on that date.

"I am grateful to the many associates who have worked alongside me and proud of what we have accomplished," Mr. Erbey said. "I am confident about Ocwen's future under the experienced leadership of the executive team. I have worked with Ron for more than 20 years, and he is uniquely qualified to lead Ocwen going forward."

Ocwen has also agreed to non-monetary provisions relating to New York borrower assistance measures, a monitor-led oversight of Ocwen's operations, interactions with related parties and certain corporate governance measures. MSR acquisitions will be subject to Ocwen meeting specified benchmarks as well as DFS approval.

8

A summary of the settlement terms is below.

**Settlement Summary of Monetary Provisions**

- Ocwen will pay a civil monetary penalty of $100 million to the DFS by December 31, 2014, which will be used by the State of New York for housing, foreclosure relief and community redevelopment programs.
- Ocwen will also pay $50 million as restitution to current and former New York borrowers in the form of $10,000 to each borrower whose home was foreclosed upon by Ocwen between January 2009 and December 19, 2014, with the balance distributed equally among borrowers who had foreclosure actions filed, but not completed, by Ocwen between January 2009 and December 19, 2014.

**Settlement Summary of Non-Monetary Provisions**

*Borrower Assistance*

Beginning 60 days after December 19, 2014, and for two years, Ocwen will:

- Provide upon request by a New York borrower a complete loan file at no cost to the borrower;
- Provide every New York borrower who is denied a loan modification, short sale or deed-in-lieu of foreclosure with a detailed explanation of how this determination was reached;
- Provide one free credit report per year, at Ocwen's expense, to any New York borrower on request if Ocwen made a negative report to any credit agency from January 1, 2010, and Ocwen will make staff available for borrowers to inquire about their credit reporting, dedicating resources necessary to investigate such inquiries and correct any errors.

*Operations Monitor*

- The DFS will appoint an independent Operations Monitor to review and assess the adequacy and effectiveness of Ocwen's operations. The Operations Monitor's term will extend for two years from its engagement, and the DFS may extend the engagement another 12 months at its sole discretion.
- The Operations Monitor will recommend and oversee implementation of corrections and establish progress benchmarks when it identifies weaknesses.

- The Operations Monitor will report periodically on its findings and progress. The currently existing monitor will remain in place for at least three months and then for a short transitional period to facilitate an effective transition to the Operations Monitor.

### Related Companies

- The Operations Monitor will review and approve Ocwen's benchmark pricing and performance studies semi-annually with respect to all fees or expenses charged to New York borrowers by any related party.
- Ocwen will not share any common officers or employees with any related party and will not share risk, internal audit or vendor oversight functions with any related party.
- Any Ocwen employee, officer or director owning more than $200,000 equity ownership in any related party will be recused from negotiating or voting to approve a transaction with the related party in which the employee, officer or director has such equity ownership, or any transaction that indirectly benefits such related party, if the transaction involves $120,000 or more in revenue or expense.

### Corporate Governance

- Ocwen will add two independent directors who will be appointed after consultation with the Monitor and who will not own equity in any related party.
- As of January 16, 2015, Bill Erbey will step down as an officer and director of Ocwen, as well as from the boards of Ocwen's related companies.
- The Operations Monitor will review Ocwen's current committees of the Board of Directors and will consult with the Board relating to the committees. This will include determining which decisions should be committed to independent directors' oversight, such as approval of transactions with related parties, transactions to acquire mortgage servicing rights, sub-servicing rights or otherwise to increase the number of serviced loans and new relationships with third-party vendors.
- The Board will work closely with the Operations Monitor to identify operations issues and ensure that they are addressed. The Board will consult with the Operations Monitor to determine whether any member of senior management should be terminated or whether additional officers should be retained to achieve the goals of complying with this Consent Order.

### MSR Purchases

- Ocwen may acquire MSRs upon (a) meeting benchmarks specified by the Operations Monitor relating to Ocwen's onboarding process for newly acquired MSRs and its ability to adequately service newly acquired MSRs and its existing loan portfolio, and (b) the DFS's approval, not to be unreasonably withheld.
- These benchmarks will address the compliance plan, a plan to resolve record-keeping and borrower communication issues, the reasonableness of fees and expenses in the servicing operations, development of risk controls for the onboarding process and development of a written onboarding plan assessing potential risks and deficiencies in the onboarding process.

(emphasis added)

35.    On December 22, 2014, HLSS filed a Form 8-K with the SEC with a press release as an exhibit stating that Defendant Erbey was stepping down as Director and Chairman of HLSS effective January 16, 2015 and Robert J. McGinnis would be the new Chairman.

36.    On the news of Defendant Erbey's resignation and Ocwen's signing of the NY DFS Consent Order, HLSS securities fell by $1.01, or about 5%, closing at $12.95 on December 22, 2014.

37.    On January 13, 2015, it was revealed that California regulators were seeking to suspend Ocwen's mortgage license. *Investor's Business Daily* published an article, "Ocwen Financial's Calif. Woes Sink Shares" detailing the California regulators' position. The article states in relevant part:

> **Trading of Ocwen Financial Group (NYSE:<u>OCWEN</u>) shares was temporarily halted after news that California may suspend the mortgage-payment collector's license, a move that would deprive the company of its largest market.**
>
> **The state alleges that Ocwen has refused over the past two years to provide sufficient information to verify whether it was obeying laws intended to prevent foreclosure-related abuse, the Los Angeles Times reported late Monday.**
>
> **Shares plunged 30% on the stock market today, hitting lows not seen since 2009.**

**Stocks of other mortgage servicers followed. Altisource Asset Management (AMEX:AAMC), a spin-off of Ocwen, caved more than 28%.** Home Loan Servicing Solutions (NASDAQ:HLSS), another spin-off, hemorrhaged as much as 24%. Nationstar Mortgate Holdings (NYSE:NSM) fell 6%, and Walter Investment Management (NYSE:WAC) lost 2%.

The sector overall has tumbled as banks have sought to unload bad mortgage-related assets, and the housing and financial markets have settled somewhat since the recession.

If California and Ocwen, which is among the biggest U.S. mortgage servicers, can't settle, the company could lose its license in the state before the end of the year, which means that it could no longer collect payments and handle foreclosures.

State and federal investigators are also examining whether Ocwen delayed short sales of some homes so it could keep collecting fees, Bloomberg said last month, citing sources.

The company has settled similar cases. William Erbey, its chairman and founder, was forced to resign last month from Ocwen and from top posts at related companies over conflict-of-interest issues and other abuses related to troubled mortgages.

Banks and their foreclosure processors in general faced a raft of criticism after reports of robo-signing and other misconduct surfaced.

(emphasis added)

38. On the same day, *Forbes* published an article " California Regulator In Process of

Suspending Ocwen Financial's Mortgage License" states relevant part:

California regulators are seeking to suspend the mortgage license of Ocwen Financial, after the servicing giant did not adequately respond to repeated information requests into its compliance with the state's Homeowner Bill of Rights. Suspension proceedings began in October, Tom Dresslar, a spokesperson for the California Department of Business Oversight told *Forbes* on Tuesday.

"Since the early part of last year, we have been asking Ocwen to provide the information we need to determine their compliance with the Homeowners Bill of Rights. They have repeatedly failed to comply with those requests," Dresslar said.

"At this point, we are seeking a suspension of their license. This matter is before an administrative law judge."

***

Were Ocwen to lose its California license it would impact 378,132 loans that the company services in the state, according to Bose George, an analyst with Keefe, Bruyette & Woods. Those loans currently carry a unpaid principal balance of $95 billion or roughly 23% of Ocwen's total UPB due.

Ocwen shares fell over 36% on Tuesday. Shares in the company have fallen over 80% in the past 12-months. **Publicly traded Ocwen affiliates Altisource Portfolio Solutions and Altisource Asset Management fell 38% and 33%. Home Loan Servicing Solutions fell nearly 20%,** while Altisource Residential Corp. fell over 6%.

***

**However, shares in the company have been battered over the past 12-months as regulators across the country accuse Ocwen of a string of legal violations. In December, New York Department of Financial Services head Benjamin Lawsky alleged that Ocwen routinely incorrectly foreclosed on homes, and had significant conflicts of interest among its related entities.**

**Ocwen settled those allegations, agreeing to pay $150 million in hard dollar assistance to New York homeowners, $50 million in direct restitution and $100 million for housing, foreclosure relief and redevelopment programs. Ocwen also agreed that founder and former billionaire Erbey would step down as executive chairman of the company and its four publicly traded affiliates.**

For Erbey, known as a penny-pincher and a tireless worker, the pact was a dramatic reversal in fortune after he built a mortgage empire out of the aftermath of the housing bust. Erbey fell out of the billionaire ranks in December, according to to Forbes's Real Time Wealth Rankings for billionaires. He was worth as much as $2.5 billion in March when we published our annual listing of the world's wealthiest.

(emphasis added)

13

39.    On the news that California regulators were proceeding to suspend Ocwen's mortgage license, HLSS securities fell by $3.14, or about 20%, closing at $12.95 on January 13, 2015.

40.    On January 23, 2015, BlueMountain sent a notice of default to HLSS and Ocwen on certain notes HLSS serviced. Due to recent regulatory sanctions against Ocwen, which also had an impact on HLSS, it constituted a breach and a default under the terms of the lending agreement. HLSS defaulted on notes worth about $1 billion. The notice of default states in relevant part:

> We write on behalf of our client BlueMountain Capital Management, LLC, as investment manager to BlueMountain Montenvers Master Fund SCA SICAV-SIF, BlueMountain Guadalupe Peak Fund L.P., and Blue Mountain Credit Alternatives Master Fund L.P. ("BlueMountain"), which own certain Series 2012-T2 and Series 2013-T3 Notes issued in connection with the HLSS Servicer Advance Receivables Trust (the "HSART Trust"). We write in reference to the Sixth Amended and Restated Indenture, dated as of January 17, 2014, including all Schedules and Exhibits thereto (the "Indenture"), by and among the HSART Trust, as Issuer, Deutsche Bank National Trust Company, as Indenture Trustee, Calculation Agent, Paying Agent and Securities Intermediary, HLSS Holdings, LLC ("HLSS"), as Administrator and as Servicer (on and after the MSR Transfer Date), Ocwen Loan Servicing, LLC ("Ocwen"), as a Subservicer and as Servicer (prior to the MSR Transfer Date), Barclays Bank PLC, as Administrative Agent, Wells Fargo Securities, LLC, as Administrative Agent, and Credit Suisse AG, New York Branch, as Administrative Agent, and all agreements referenced therein, including without limitation all the Designated Servicing Agreements and Transaction Documents. Unless otherwise specified, capitalized terms used but not defined in this letter have the meanings ascribed to them in the Indenture and the Master Subservicing Agreement, dated as of February 10, 2012, by and between HLSS, as Servicer and Ocwen, as Subservicer.
>
> As particularized herein, **we write to provide notice that Events of Defaults exist under the Indenture pursuant to (i) Section 8.1(d), resulting from Ocwen's material breach of its covenants to, among other things, comply with applicable laws and requisite servicing obligations; (ii) Section 8.1(m)(i), resulting from Ocwen's breach of a warranty in the Senior Secured Term Loan Facility Agreement and a subsequent amendment thereto that it is not in violation of any law that could reasonably be expected to cause, among other things, a material adverse effect on Ocwen's business and financial condition; and (iii) Section 8.1(g), resulting from the failure of the Collateral Test, which measures whether the Notes are adequately collateralized.**

**The facts establishing these Events of Default are irrefutable.** For example, Ocwen recently "stipulate[d]" and "agree[d]" in a consent order with the New York Department of Financial Services to violations of law and to engaging in imprudent servicing practices. In addition, the California Department of Business Oversight has commenced proceedings to suspend Ocwen's servicer license in California, a significant source of loans in the RMBS trusts that generate the advances that collateralize the payments to Noteholders. These (and other) agencies' findings and enforcement actions demonstrate Ocwen's systemic, long-standing and continuing servicing failures and disregard of applicable and analogous laws. Evidencing the significance of these affirmations of Ocwen's servicing misconduct, the rating agencies expressly referenced the state regulatory authorities' actions as a basis for their decisions to downgrade Ocwen's servicer rating and the corporate ratings of related entities, Ocwen Financial Corporation and Home Loan Servicing Solutions, Ltd. Likewise, the share price of the two related companies fell precipitously following the announcement of the California suspension proceeding, *i.e.*, by approximately 36% and 20%, respectively.

**The recent disclosures thus demonstrate Ocwen's material breaches of its covenants and warranties not to engage in such illicit and imprudent practices; and those breaches in turn materially increase the risk of loss on the Notes that are collateralized by receivables affected by Ocwen's standing as a servicer.** Indeed, the offering memorandum governing the issuance of the Notes explicitly recited the very servicing misconduct that Ocwen engaged in as a factor that would increase the risk of loss on the Notes. That material increase in the risk of loss gives rise to the specified Events of Default, and a corresponding right to an increased return for the Noteholders.

Specifically, **under the bargained-for terms of the Indenture, the Note Interest Rate is increased by 3.00% upon the occurrence of any Event of Default to compensate the Noteholders for the associated increased risk of loss.** Deutsche Bank National Trust Company, in its capacity as Calculation Agent, must provide "written notice specifying the nature and status of any . . . Event of Default, Facility Early Amortization Event or other event or occurrence which could have an Adverse Effect." (Indenture § 3.3(b).) Such notice must be provided to the Noteholders, the Indenture Trustee, the Issuer and each Note Rating Agency promptly after receiving knowledge of such event, but no later than three Business Days thereafter

* * *

(emphasis added)

41. Later in the day of January 23, 2015, *Forbes* published an article "Ocwen Financial Keeps California Mortgage License, Sued by Bondholders" that discussed a settlement between Ocwen and the DBO and the notice of default it received from BlueMountain. The article states in relevant part:

> The California Department of Business Oversight (DBO) is dropping an effort to suspend Ocwen Financial's mortgage license in the state, after reaching a settlement with the embattled mortgage servicing giant.
>
> The DBO said on Friday evening it has reached a $2.5 million settlement with Ocwen Loan Servicing, and will drop an effort to suspend the company's mortgage license, which it filed in a California court in October. That threat came after the DBO said Ocwen was unresponsive to information requests the regulator made after receiving complaints about the servicer over the course of multiple years.
>
> "The Department is committed to supporting a fair and secure financial services marketplace for all California consumers," DBO Commissioner Jan Lynn Owen, said in a statement. "This settlement allows us to move forward and ensure that Ocwen is meeting its obligations under the law."
>
> **As part of the settlement, Ocwen will be prohibited from taking new California customers until the DBO determines it is in compliance with state laws such as the California Residential Mortgage Lending Act and the 2012 Homeowner Bill of Rights. Under the consent order, Ocwen will allow a third-party monitor to review its compliance with the DBO's information requests and state laws.**
>
> **The monitor will also audit Ocwen's loan servicing procedures, processes and staffing levels. The DBO retains the ability to pursue enforcement against Ocwen if the examination of loan files uncovers violations of the California laws.**

Friday's settlement is likely to be taken positively. Had Ocwen lost its mortgage license in California, the sanction would impact 378,132 loans that the company services in the state. Those loans currently carry a unpaid principal balance of $95 billion or roughly 23% of Ocwen's total UPB due, according to analyst estimates.

While the pact with the DBO can help remove some major uncertainties for Ocwen, significant issues continue to emerge for the company.

Earlier in the day, BlueMountain Capital disclosed it was shorting the stock of Ocwen Financial and one of its publicly traded affiliates Home Loan Servicing Solutions. **The hedge fund also delivered a notice of default against a receivables trust that is a key funding source for Ocwen, battering shares of both Ocwen and HLSS.**

**BlueMountain believes that regulatory sanctions against Ocwen have put some of the RMBS trusts it services in position of default. As a result, the hedge fund has bought what it believes are defaulted notes, and shorted both the stock of Ocwen and HLSS. On Friday, the hedge fund delivered a notice of default on the notes it owns, Series 2012-T2 and Series 2013-T3 Notes issued in connection with the HLSS Servicer Advance Receivables Trust[.]**

BlueMountain also said it directed the trustees of some RMBS investors "to investigate and/or take action with respect to Ocwen Loan Servicing." Those efforts appear to have succeeded.

Law firm Gibbs & Bruns said late on Friday that 25% of voting rights in 119 Residential Mortgage Backed Securities Trusts that count Ocwen Financial as a master servicer issued a notice of non-performance to their trustees BNY Mellon, Citibank, Deutsche Bank , HSBC, US Bank, and Wells Fargo Those trusts contain an original mortgage balance of $82 billion, Gibbs & Bruns said.

**"Based on a lengthy investigation and analysis by independent, highly qualified experts, the Holders' Notice alleges Ocwen has failed to perform, in material respects, its contractual obligations as Servicer and/or Master Servicer under the applicable [pooling and servicing agreements]," Gibbs &**

**Bruns said[.]**

The firm cited Ocwen's use of trust funds to pay for borrower relief, conflicts of interest that enriched affiliates like Altisource and HLSS, and the company's poor record keeping. It said those issues have caused trusts serviced by Ocwen to perform "materially worse" than those of other servicers.

"The Holders further allege that these claimed defaults and deficiencies in Ocwen's performance have materially affected the rights of the Holders and constitute an ongoing Event of Default under the applicable PSAs," Gibbs & Bruns concluded.

(emphasis added)

42.     On the news of HLSS defaulting on the notes with BlueMountain, HLSS securities fell by $1.59, or about 10%, closing at $13.76 on January 23, 2015 with extraordinary trading volume.

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

43.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired HLSS securities during the Class Period (the "Class"); and were damaged thereby. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

44.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, HLSS securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or

thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by HLSS or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

45.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

46.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

47.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of HLSS;

- whether the Individual Defendants caused HLSS to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

-  whether the prices of HLSS securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

19

48.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

### APPLICATION OF PRESUMPTION OF RELIANCE:
### FRAUD ON THE MARKET

49.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

   a.   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

   b.   the omissions and misrepresentations were material;

   c.   HLSS securities are traded in efficient markets;

   d.   the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

   e.   the Company traded on NASDAQ, and was covered by multiple analysts;

   f.   the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

   g.   Plaintiff and members of the Class purchased and/or sold HLSS securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

50.     At all relevant times, the market for HLSS securities was efficient for the following reasons, among others:

    a.   As a regulated issuer, HLSS filed periodic public reports with the SEC;

    b.   HLSS regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

    c.   HLSS was followed by several securities analysts employed by a major brokerage firms who wrote reports that were distributed to the sales force and certain customers of his/her brokerage firm during the Class Period. Each of these reports were publicly available and entered the public marketplace;

    d.   Numerous FINRA member firms were active market-makers in HLSS stock at all times during the Class Period; and

    e.   Unexpected material news about HLSS was rapidly reflected and incorporated into the Company's stock price during the Class Period.

51.     As a result of the foregoing, the market for HLSS's common stock promptly digested current information regarding HLSS from all publicly available sources and reflected such information HLSS's stock price. Under these circumstances, all purchasers of HLSS's common stock during the Class Period suffered similar injury through their purchase of HLSS's common stock at artificially inflated prices, and a presumption of reliance applies.

### APPLICABILITY OF PRESUMPTION OF RELIANCE:
### AFFILIATED UTE

52.     Neither plaintiffs nor the Class (defined herein) need prove reliance – either individually or as a class – because under the circumstances of this case, which involve omissions of material fact as described above, positive proof of reliance is not a prerequisite to recovery, pursuant to the ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 1456, 31 L. Ed. 2d 741 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### COUNT I

### For Violations of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

53.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

54.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

55.     During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout

the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of HLSS securities; and (iii) cause Plaintiff and other members of the Class to purchase HLSS securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

56.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for HLSS securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about HLSS's finances and business prospects.

57.     By virtue of their positions at HLSS, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

58.     Information showing that defendants acted knowingly or with reckless disregard or the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or

directors of HLSS, the Individual Defendants had knowledge of the details of HLSS internal affairs.

59.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of HLSS. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to HLSS's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of HLSS securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning HLSS's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased HLSS securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

60.     During the Class Period, HLSS securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of HLSS securities at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased said securities, or would not have purchased them at the inflated prices that were paid. At the time of the purchases by Plaintiff and the Class, the true value of HLSS securities was substantially lower than the prices paid by Plaintiff and the other members

of the Class. The market price of HLSS securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

61.     By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

62.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### For Violations of §20(a) of the Exchange Act
### Against All Defendants

63.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

64.     During the Class Period, the Individual Defendants participated in the operation and management of HLSS, and conducted and participated, directly and indirectly, in the conduct of HLSS's business affairs. Because of their senior positions, they knew the adverse non-public information about HLSS's misstatement of income and expenses and false financial statements.

65.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to HLSS's financial condition and results of operations, and to correct promptly any public statements issued by HLSS's which had become materially false or misleading.

66. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which HLSS disseminated in the marketplace during the Class Period concerning HLSS's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause HLSS to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of HLSS within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of HLSS securities.

67. Each of the Individual Defendants, therefore, acted as a controlling person of HLSS. By reason of their senior management positions and/or being directors of HLSS, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, HLSS to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of HLSS and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

68. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by HLSS.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)   Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

(b)   Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)   Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)   Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: January 29, 2015                     Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**


Jonathan Horne, Esq. (JH-7258)
Phillip Kim, Esq.  (PK-9384)
Laurence M. Rosen, Esq. (LR-5733)
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone:  (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com

Counsel for Plaintiff

27

# Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Laws

The individual or institution listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by The Rosen Law Firm P.A., retains The Rosen Law Firm P.A. to file an action under the federal securities laws to recover damages and to seek other relief against ChannelAdvisor Corporation. The Rosen Law Firm P.A. will prosecute the action on a contingent fee basis and will advance all costs and expenses. The ChannelAdvisor Corporation. Retention Agreement provided to the Plaintiff is incorporated by reference, upon execution by The Rosen Law Firm P.A.

| | |
|---|---|
| **First name:** | Justin |
| **Middle initial:** | |
| **Last name:** | Dice |
| **Address:** | ███████████████ |
| **City:** | ████ |
| **State:** | █ |
| **Zip:** | ███ |
| **Country:** | ███ |
| **Facsimile:** | |
| **Phone:** | █████████ |
| **Email:** | █████████████ |

Plaintiff certifies that:

1. Plaintiff has reviewed the complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.

5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

6. Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

Acquisitions:

| Type of Security | Buy Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 12/15/2014 | 300 | 20.13 |

7. I have not served as a representative party on behalf of a class under the federal security laws during the last three years, except if detailed below. [ ]

I declare under penalty of perjury, under the laws of the United States, that the information entered is accurate:          **YES**

**Certification for Justin Dice (cont.)**

By clicking on the button below, I intend to sign and execute
this agreement and retain the Rosen Law Firm, P.A. to
proceed on Plaintiff's behalf, on a contingent fee basis.          **YES**

Signed pursuant to California Civil Code Section 1633.1, et seq. - and the Uniform Electronic
Transactions Act as adopted by the various states and territories of the United States.

Date of signing: 01/14/2015