**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE HOME LOAN SERVICING SOLUTIONS, LTD. SECURITIES LITIGATION | Master File No. 1:15-cv-00652-VM<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL REQUESTED** |

# TABLE OF CONTENTS


GLOSSARY OF TERMS AND ABBREVIATIONS ..... iv

I. JURISDICTION AND VENUE ..... 1

II. SYNOPSIS OF THE FRAUD ..... 2

III. THE PARTIES ..... 5

A. Lead Plaintiffs ..... 5

B. Defendants ..... 6

1. HLSS ..... 6

2. The Individual Defendants ..... 7

IV. BACKGROUND AND NATURE OF THE FRAUD ..... 8

A. HLSS Exists Only To Acquire Mortgage Servicing Rights From Ocwen ..... 8

B. The Ocwen Complex Of Companies ..... 10

C. Defendant Erbey's Role In HLSS And The Ocwen Complex ..... 14

D. Defendants Materially Misrepresented—And Actively Concealed—The True Nature Of The Relationship Between HLSS And Ocwen ..... 17

E. Erbey And Ocwen Serially Violate The Law ..... 18

1. The NYDFS Scrutinizes Ocwen's Illicit Practices ..... 18

2. The NYDFS Investigation Of Ocwen Leads To A Series Of Revelations Concerning The Misconduct In The Ocwen Complex ..... 21

3. The CDBO Consent Order Against Ocwen ..... 29

4. The HLSS Facade Begins To Crumble ..... 30

V. THE TRUTH BEGINS TO EMERGE ..... 31

VI. POST-CLASS PERIOD DEVELOPMENTS AND ADMISSIONS ..... 39

VII. DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS ..... 43

A. False Statements Regarding Ocwen's Servicing Capabilities And Performance ..... 43

B. False Statements Regarding Legal Proceedings And Other Contingent Matters ....................46

C. False Statements Regarding HLSS's Risk Management and Internal Controls....................48

D. False Statements Regarding Related Party Transactions....................53

VIII. HLSS'S VIOLATIONS OF GAAP AND SEC REGULATIONS....................56

A. Overview and Background of GAAP ....................56

B. HLSS's Business Model ....................57

C. Defendants' Improper Accounting of Notes Receivable – Rights to MSRs ....................58

D. Defendants Failed to Disclose the Company's Accounting Policies....................59

E. Defendants' Accounting Improprieties Were Material to HLSS's Financial Statements as Evidenced by the Restatement Itself....................60

IX. ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER ....................63

X. LOSS CAUSATION....................67

XI. PRESUMPTION OF RELIANCE....................70

XII. INAPPLICABILITY OF SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ....................71

XIII. CLASS ACTION ALLEGATIONS ....................72

XIV. CLAIMS UNDER THE EXCHANGE ACT....................74

XV. PRAYER FOR RELIEF ....................78

XVI. JURY DEMAND....................78

# GLOSSARY OF TERMS AND ABBREVIATIONS

| Term/Abbreviation | Definition |
|---|---|
| AAMC | Altisource Asset Management Corporation; "asset manager" for RESI, performing nominal functions such as administering property management. |
| Administrative Services Agreement | Agreement between HLSS and Altisource for administrative services where Altisource supplies HLSS with certain operational functions including human resources, law, risk management, corporate services, finance, accounting, and vendor management operations. |
| Advances | Funds used to cover late payments on mortgages, insurance, and other measures taken to protect the asset. |
| Advance Financing Facility | Mechanism that securitizes assets, the proceeds of which are used to fund advances |
| AICPA | American Institute of CPAs. |
| Altisource | Altisource Portfolio Solutions, S.A.; Ocwen spinoff and provider of mortgage servicing technologies. |
| AMSP | Agreement on Mortgage Servicing Practices; September 1, 2011 agreement between NYDFS and Ocwen where Ocwen agreed to comply with the NYDFS's Mortgage Servicing Practices in exchange for the NYDFS's approval of Litton acquisition. |
| April 2014 Letter | Letter issued by NYDFS on April 21, 2014 regarding potential "self dealing" between Ocwen and Altisource in regards to Hubzu. |
| ASC | Accounting Standards Codification. |
| Asset Sale | $1.2 billion Sale of substantially all HLSS assets to New Residential in April 2015. |
| August 2014 Letter | Letter issued by NYDFS on August 4, 2014 regarding Ocwen using SWBC, to kick back fees to Altisource for the placement of force-placed insurance on homeowners whose loans Ocwen was servicing. |
| BlueMountain | BlueMountain Capital Management; hedge fund and holder of HLSS bonds that sent notices of default to HLSS on |

| Term/Abbreviation | Definition |
|---|---|
| | January 23, 2015 and February 20, 2015. |
| CDBO | California Department of Business Oversight. |
| CDBO consent order | $2.5 million settlement between CDBO and Ocwen, entered into on January 23, 2015, prohibiting Ocwen from acquiring additional MSRs in California until CDBO approval acquired, providing for CDBO's appointment of independent, third party auditor, and entitling CDBO to pursue enforcement action. |
| CFPB | Consumer Financial Protection Bureau. |
| Compliance Monitor | Onsite, independent monitor tasked with conducting a comprehensive review of Ocwen's servicing operations, including its compliance program and operational policies and procedures, pursuant to the 2012 Consent Order. |
| Erbey | William C. Erbey; Defendant and former Chairman of the Boards of Directors of Altisource, RESI, AAMC, and HLSS and former Executive Chairman of Ocwen. |
| FASB | Financial Accounting Standards Board; group to whom SEC has delegated authority to codify GAAP. |
| February 2014 Letter | Letter issued by NYDFS on February 26, 2014 exposing Ocwen and Ocwen Complex conflicts of interest, including Ravi's role at Ocwen and Altisource and Erbey's shareholder and chairman status at the related parties. |
| FTC | Federal Trade Commission. |
| GAAP | United States Generally Accepted Accounting Principles. |
| HLSS or the Company | Home Loan Servicing Solutions, Ltd., acquires MSRs from Ocwen and then contracts with Ocwen to service the loans. |
| IPO | Initial Public Offering. |
| Homeward | Homeward Residential Holdings, LLC (formerly American Home Mortgage); acquired in 2012 by Ocwen via merger. |
| HomEq | HomEq Servicing, Barclays' MSR platform sold to Ocwen in 2010. |

| Term/Abbreviation | Definition |
|---|---|
| HSART | Home Servicing Advance Receivables Trust. |
| Hubzu | Altisource subsidiary and online auction site for the sale of homes facing foreclosure and investor-owned properties following foreclosure. |
| Lauter | James E. Lauter; Defendant and CFO and Executive V.P. of HLSS since the Company's March 2012 IPO. |
| Lawsky | Benjamin M. Lawsky; Superintendent of the NYDFS. |
| Litton | Litton Loan Servicing LP.; subject of a 2011 acquisition that would increase Ocwen's servicing portfolio by over $38 billion, or more than 53% of the total UPB of Ocwen's servicing portfolio as of March 31, 2011. |
| Mangrove Partners | Mangrove Partners Master Fund, Ltd.; a significant HLSS shareholder who sent letters in February 2015 to HLSS, urging the Company to exercise its contractual rights to terminate its relationship with Ocwen. |
| MSRs | A contractual obligation where the original mortgage lender sells the right to perform loan servicing functions such as collections to a third-party, who collects a fee in exchange. |
| National Mortgage Settlement | February 2012 agreement between attorneys general of 49 states and the District of Columbia, the federal government, and five banks and mortgage servicers (Bank of America, Citi, JPMorgan Chase, Wells Fargo and GMAC/ResCap) that created heightened servicing standards, provided for relief to distressed homeowners and provided funding for state and federal governments. |
| New Residential | New Residential Investment Corp.; a publicly traded REIT that focuses on investing in, and actively managing, investments primarily related to residential real estate. |
| Rights to MSRs | A contractual purchase of MSRs by a third party |
| Notes receivable—Rights to MSRs | The amount of the net servicing and other related fees retained with respect to the Rights to MSRs less the periodic change in the carrying value of the Notes receivable |

| Term/Abbreviation | Definition |
|---|---|
| NYDFS | New York State Department of Financial Services. |
| October 2014 letter | Letter issued by NYDFS on October 21, 2014 regarding Ocwen backdating hundreds of thousands of letters to prevent borrowers from receiving modification benefits and avoiding late fees |
| Ocwen | Ocwen Financial Corporation; provides mortgage loan servicing and origination in the United States. |
| Ocwen Complex or the related parties | Altisource, AAMC, RESI and HLSS; mortgage-related businesses, created and spun off from Ocwen by Erbey. |
| Ravi | S.P. Ravi. Ravi was both Ocwen's and Altisource's Chief Risk Officer. |
| ResCap | Residential Capital, LLC (formerly GMAC ResCap, Inc.); acquired by Ocwen in 2012 pursuant to a plan under Chapter 11 of Title 11 of the U.S. Bankruptcy Code. |
| REIT | Real Estate Investment Trust. |
| RESI | Altisource Residential Corporation; focuses on acquiring and owning single-family rental assets following foreclosure. |
| PFIC | Passive Foreign Investment Company. |
| Professional Services Agreement | Agreement between Ocwen and HLSS for professional services rendered by Ocwen, HLSS pays Ocwen the "fully allocated cost," which includes incentive amounts as well as fees to third parties (further benefitting the Ocwen complex), "plus an applicable mark-up" of 15%. |
| Purchase Agreement | Agreement between HLSS and Ocwen where HLSS pays Ocwen a monthly base fee and a performance-based incentive fee in exchange for servicing the mortgages. |
| REALServicing | Servicing platform owned and leased by Ocwen from Altisource. |
| Saxon | Saxon Mortgage Services |
| SEC | The U.S. Securities and Exchange Commission. |

| Term/Abbreviation | Definition |
|---|---|
| Sixth Amended and Restated Indenture | The set of terms and provisions governing the HLSS Servicer Advance Receivables Trust. |
| SOX | The Sarbanes-Oxley Act of 2002. |
| Subservicing Agreement | Agreement between HLSS and Ocwen determining rates HLSS paid for Ocwen's services. |
| SWBC | Southwest Business Corporation. |
| UPB | Unpaid Principal Balance. |
| Van Vlack | John P. Van Vlack; Defendant, Director (since Oct. 2011), President and CEO (since Mar. 2012) at HLSS. |
| 2012 Consent Order | Consent order entered into on December 5, 2012 where NYDFS caused Ocwen to submit to the Compliance Monitor, to ensure compliance with the AMSP. |
| 2014 Consent Order | Consent order between NYDFS and Ocwen entered into on December 22, 2014 where Ocwen admitted to "numerous and significant violations of New York State laws and regulations," and engaging in "repeated non-compliance" of prior regulatory orders. |

## I. JURISDICTION AND VENUE

1. Lead Plaintiffs, the West Palm Beach Police Pension Fund ("WPB Police"), the City of Fort Lauderdale Police and Firefighters' Retirement System ("FTL P&F"), and The Police Retirement System of St. Louis ("St. Louis Police," and together with WPB Police and FTL P&F, "Lead Plaintiffs"), bring this securities fraud class action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), on behalf of themselves and all persons or entities who purchased or otherwise acquired the common stock of Home Loan Servicing Solutions, Ltd., ("HLSS" or the "Company") during the period between February 28, 2012 and January 22, 2015, inclusive (the "Class Period"), and were damaged thereby (the "Class").

2. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa. In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this District.

3. In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of a national securities exchange.

## II. SYNOPSIS OF THE FRAUD

4. Defendant William C. Erbey orchestrated a fraudulent mortgage servicing scheme through a series of complicated corporate structures, including HLSS, which—after a two-year investigation by regulators that culminated in a consent order forcing his resignation from these companies—ultimately caused the destruction of billions of dollars of investor and homeowner wealth. The centerpiece of Erbey's corporate complex was Ocwen Financial Corporation ("Ocwen"), a mortgage origination and servicing company, which served as the central hub around which HLSS and Erbey's other companies revolved.

5. In a transparent manipulation of the U.S. tax code, Erbey founded HLSS for the sole purpose of purchasing the servicing rights of mortgage assets from Ocwen and then immediately hiring Ocwen to perform this servicing for a small servicing fee, thereby sheltering the vast majority of Ocwen's assets in the Cayman Islands tax haven where HLSS was incorporated. ***HLSS did not originate or service any of the assets it acquired***, and it derived revenue solely from its share of what Ocwen collects from mortgage servicing. Erbey created several other companies to perform various other aspects of the mortgage servicing of Ocwen's assets at premium rates, thereby extracting substantial additional and unnecessary costs and fees from already beleaguered homeowners. Erbey simultaneously served as the Chairman of each of these companies and exercised near-dictatorial control over HLSS and the Ocwen complex.

6. Defendants lied and omitted material information concerning the fundamental nature of HLSS's business, including the Company's relationship with Ocwen, its business dealings, mortgage servicing activities, financial results and legal compliance. These misrepresentations artificially inflated the price of HLSS's common stock during the Class Period. As regulatory findings and admissions regarding the misconduct prevalent throughout the Erbey web of mortgage-related companies slowly came to light, the truth concerning

Defendants' materially false and misleading statements regarding HLSS was also revealed, ultimately leading to Erbey's ouster as Chairman of HLSS, a restatement of the Company's financial statements, and a last-minute asset sale to a competitor. As a result, the price of HLSS common stock plummeted, causing substantial damages to the Class.

7. Defendants repeatedly touted Ocwen's servicing capabilities as "superior relative to other servicers" and that HLSS was paying market prices for services from Ocwen and other Ocwen-related companies, thus rationalizing HLSS's complete dependency on Ocwen. Defendants deceived the market to believe that the transactions between HLSS and Ocwen were at arm's-length, and that the Company implemented internal controls to ensure that its affiliation with the Erbey enterprises was free from self-dealing and conflicts of interest. Such internal controls were crucial to ensure that the Company's financial statements were accurate and calculated in accordance with Generally Accepted Accounting Principles ("GAAP"). As the Ocwen fraudulent scheme was slowly revealed to the market, Defendants continued to emphasize that HLSS would not be materially affected by Ocwen's misconduct.

8. Defendants' representations in each of these respects were critical to investors given the inherent conflicts between Erbey, HLSS and Ocwen, and the resulting potential for corporate abuses and conflicts of interest arising from these relationships. These affirmations were particularly significant in light of the strict regulatory environment prevalent in the United States following the collapse of the residential housing and subprime markets, which exposed a myriad of illegal and unethical practices that preyed upon borrowers. Regulators such as the New York State Department of Financial Services ("NYDFS"), as well as other state and Federal regulators, scrutinized the legality of Erbey's web of mortgage-servicing companies. Defendants' representations concerning the propriety of HLSS's business and operational

structure artificially inflated the Company's stock price, which reached a Class Period high of $25.41 on August 1, 2013.

9. Unfortunately for the Class, Defendants' assurances were false. Beginning in August 2014 with HLSS's restatement of ***nine*** quarters of financial statements, a series of partial disclosures exposed Defendants' fraudulent scheme. In connection with the restatement, HLSS admitted that the Company suffered from material weaknesses in its internal control over financial reporting and that its asset valuation methods did not comply with GAAP.

10. In addition, a two-year long investigation by the NYDFS culminated in a December 22, 2014 consent order (the "2014 Consent Order") in which Ocwen admitted to "numerous and significant violations of New York State laws," and engaging in "repeated non-compliance" of prior regulatory orders. Notably, the 2014 Consent Order found that the NYDFS "uncovered a number of conflicts of interest" between Ocwen and the other Erbey-related companies, including HLSS. The 2014 Consent Order exposed Erbey's incestuous relationship with the five Ocwen-related companies, as well as the lack of any written policy requiring conflicted executives to recuse themselves from involvement in related-party transactions. The 2014 Consent Order mandated Defendant Erbey's resignation as Chairman of HLSS, Ocwen and the other related companies.

11. Over the course of the next several months, additional information concerning Ocwen and HLSS's illicit practices came to light, including actions by the California Department of Business Oversight, several analyst downgrades and two notices of default against the Company, culminating in an eleventh-hour asset sale necessary for the Company to remain a going concern. Through this downward spiral, HLSS's shares plummeted to $13.07 at the end of

the Class Period—a stunning collapse that wiped out hundreds of millions of dollars of market capitalization, and a far cry from the Company's Class Period high of $25.41 on August 1, 2013.

## III. THE PARTIES

### A. Lead Plaintiffs

12. West Palm Beach Police Pension Fund is a pension fund based in West Palm Beach, Florida that provides retirement benefits for police officers. As of September 30, 2014, WPB Police oversaw 226 active members and 265 retirees and beneficiaries. WPB Police's combined Plan assets are in excess of $257 million. As set forth in its certification previously filed with the Court and incorporated herein by reference (ECF No. 12-2), WPB Police purchased HLSS common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein. On April 28, 2015, the Court appointed WPB Police as Lead Plaintiff.

13. The City of Fort Lauderdale Police and Firefighters' Retirement System manages approximately $800 million in assets. As set forth in its certification previously filed with the Court and incorporated herein by reference (ECF No. 12-2), FTL P&F purchased HLSS common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein. On April 28, 2015, the Court appointed FTL P&F as Lead Plaintiff.

14. The Police Retirement System of St. Louis is a public pension fund that has been helping ensure the financial security of its police officer members and their families since 1957. St. Louis Police manages assets in excess of $722 million. As set forth in its certification previously filed with the Court and incorporated herein by reference (ECF No. 12-2), St. Louis Police purchased HLSS common stock during the Class Period and suffered damages as a result

of the violations of the federal securities laws alleged herein. On April 28, 2015, the Court appointed St. Louis Police as Lead Plaintiff.

15. Lead Plaintiffs' allegations herein are based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Lead Plaintiffs' information and belief are based on the independent investigation of their undersigned counsel. This investigation includes review and analysis of (i) HLSS's public filings with the Securities and Exchange Commission (the "SEC"); (ii) research reports by securities and financial analysts; (iii) transcripts of HLSS's conference calls with analysts and investors; (iv) presentations, press releases, and reports; (v) media reports concerning the Company and related facts; (vi) data reflecting the pricing of HLSS common stock; and (vii) other material and data concerning the Company, as identified herein. Counsel's investigation into the factual allegations continues, and many of the relevant facts are known only by the Defendants or are exclusively within their custody or control. Lead Plaintiffs believe that substantial additional evidentiary support is likely to exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.

**B. Defendants**

**1. HLSS**

16. Defendant HLSS is a Cayman Islands exempted company with its principal executive offices located at 190 Elgin Avenue, George Town, Grand Cayman, KY1-9005, Cayman Islands. Common shares of HLSS traded on the NASDAQ National Market System under the symbol "HLSS" from the February 29, 2012 date of its Initial Public Offering ("IPO"), until HLSS was delisted, pursuant to the terms of its asset sale to New Residential, effective on April 29, 2015, at which time it began being quoted on the OTC Pink Marketplace under the

symbol "HLSSF." As of December 31, 2014, there were over 71 million shares of HLSS common stock outstanding.

17. Following the New Residential asset sale, New Residential, through HLSS MSR-EBO Acquisition LLC and HLSS Advances Acquisition Corp., assumed the Company's liabilities, including "all liabilities with respect to any litigation, suit, action, arbitration or other proceeding whether or not related to the ownership of the Purchased Assets." Further, as reiterated in HLSS's press release announcing the Asset Sale, "New Residential acquired substantially all of the assets, and assumed substantially all of the liabilities of HLSS."

**2. The Individual Defendants**

18. Defendant William C. Erbey ("Erbey") is the founder of HLSS and served as its Chairman from inception until his resignation in accordance with the 2014 Consent Order, effective January 16, 2015. Defendant Erbey served as the Executive Chairman of the Board of Directors of Ocwen from September 1996 to January 2015, Chief Executive Officer ("CEO") of Ocwen from January 1988 to October 2010, and President from January 1988 to May 1998. Defendant Erbey also served as the Chairman of the Board of Directors of Altisource Portfolio Solutions, S.A. ("Altisource") from August 2009 to January 2015, as Chairman of the Board of Directors of Altisource Residential Corporation ("RESI") from July 2012 to January 2015, and Chairman of the Board of Directors of Altisource Asset Management Corporation ("AAMC") from March 2012 to January 2015. Defendant Erbey previously served as a Managing General Partner of The Oxford Financial Group, a private investment partnership that was the predecessor of Ocwen. Under the terms of the 2014 Consent Order, Defendant Erbey resigned as Executive Chairman of Ocwen, and as the Chairman of Altisource, RESI, AAMC and HLSS.

19. Defendant John P. Van Vlack ("Van Vlack") has served as a Director since October 2011, and was appointed President and CEO in March 2012. He served as Executive Vice President, Chief Financial Officer ("CFO") and Chief Accounting Officer of Ocwen from August 2010 until March 2012. After the Company's IPO, Van Vlack left Ocwen and became the Director, President, and CEO of HLSS.

20. Defendant James E. Lauter ("Lauter") has served as Chief Financial Officer ("CFO") and Executive Vice President of HLSS since its March 2012 IPO, and Senior Vice President of HLSS since March 5, 2012. He served as Vice President, Finance, at Ocwen from September 2010 through February 2012. After the Company's IPO, Lauter left Ocwen and became CFO and Executive Vice President of HLSS.

## IV. BACKGROUND AND NATURE OF THE FRAUD

### A. HLSS Exists Only To Acquire Mortgage Servicing Rights From Ocwen

21. HLSS was incorporated on December 1, 2010, in George Town, Cayman Islands. Because the Cayman Islands is a notorious tax haven with practically no direct corporate income tax, HLSS's effective tax rate was essentially zero for 2012 and 2013.[1] HLSS's business was primarily limited to one thing: acquiring mortgage servicing rights ("MSRs") from Ocwen,[2] and immediately paying Ocwen a fee to service the mortgages.[3] Mortgage "servicing" refers to the administration of a mortgage, including activities such as collecting payments, applying payments, maintaining records, and corresponding with mortgagors. Over the years, it has

---

[1] HLSS 2014 Form 10-K (filed on Apr. 6, 2015) at p. 40.

[2] HLSS acquired its MSRs from Ocwen Loan Servicing, LLC (a wholly-owned subsidiary of Ocwen).

[3] "The Company's sole business will be the purchase and servicing of mortgage servicing assets." HLSS Responses to SEC Comment Letter dated November 18, 2011, p.5 *available at* http://www.sec.gov/Archives/edgar/data/1513161/000119312512075314/filename1.htm.

become a common practice to pool mortgages, assign them to a legal entity such as a trust, and issue securities backed by the mortgages. Investors purchase these securities in return for the receipt of the future payment stream, which consists of the principal and interest payments from borrowers. Mortgage servicers are responsible for distributing these payments to investors. To that end, mortgage servicers pursue late payments from delinquent borrowers, initiate foreclosures, or attempt other mitigation techniques such as loan modifications. In return for servicing the loans, servicers are compensated in the form of servicing fees. Servicers earn the majority of their revenue from servicing fees, which oftentimes include administrative and penalty fees imposed on borrowers.

22. The initial sale of assets from Ocwen to HLSS was governed by terms documented in a purchase agreement between HLSS and Ocwen (the "Purchase Agreement") entered into on February 10, 2012. Under the terms of the Purchase Agreement, HLSS paid Ocwen a monthly base fee and a performance-based incentive fee in exchange for servicing the mortgages. The rates HLSS pays for Ocwen's services are determined by the subservicing agreement entered into by HLSS and Ocwen (the "Subservicing Agreement") on February 10, 2012, which effectively divided mortgage servicing proceeds between HLSS and Ocwen at 88% and 12%, respectively.

23. A February 10, 2012 professional services agreement between Ocwen and HLSS entered into in anticipation of HLSS's IPO, (the "Professional Services Agreement") specifies that, in return for professional services rendered by Ocwen, HLSS would pay Ocwen the "fully allocated cost," which included incentives and fees to third parties (further benefitting the Ocwen complex), "plus an applicable mark-up" of 15%. Despite the conflicted posture of this transaction, neither HLSS nor Ocwen elaborated on the specifics underlying the initial

compensation setting or potential further adjustments. The remainder of HLSS's operations was sourced from the Ocwen complex through an agreement between HLSS and Altisource for administrative services (the "Administrative Services Agreement") entered into on February 10, 2012. According to Schedule I to the Administrative Services Agreement, Altisource supplies HLSS with certain operational functions, including human resources, law, risk management, (capital markets, modeling, quantitative analytics, general business consulting, consumer psychology service), corporate services (facilities management, reception and mailroom support, physical security, travel services), finance and accounting, and vendor management operations.

**B. The Ocwen Complex Of Companies**

24. HLSS is part of a larger hub-and-spoke complex of companies related to Ocwen, which also includes Altisource,[4] Altisource subsidiary Hubzu, RESI,[5] and AAMC[6] (the "Ocwen complex"). The business of all of the companies in the Ocwen complex comes solely from – and depends solely upon – every other company in the complex.

25. Founded by Erbey in 1988, Ocwen is a financial services company engaged in the servicing of residential special and subprime mortgage loans. Originally organized as a thrift

[4] Altisource was spun off from Ocwen on August 10, 2009, and upon Altisource's separation, Ocwen entered into several long-term agreements with Altisource, such as the provision of insurance, "process outsourcing," "valuation," and "property preservation and inspection." Altisource is the company that handles the placement of insurance and other "preservation" techniques—all for various fee amounts. Ocwen often passes the cost along to borrowers by assessing extra fees for these services.

[5] RESI was spun off from Ocwen on December 21, 2012, specialized in acquiring foreclosed homes and turning them into rental properties. RESI acquires all of its properties from Ocwen, who—when unable to sell the properties—transfers them to RESI. Defendant Erbey owned as much as 5% of all outstanding shares of RESI as of December 31, 2013. RESI also obtains all of its operational functions through services agreements with Ocwen and Altisource.

[6] AAMC functions as an "asset manager" for RESI, performing nominal functions such as administering property management. As of December 31, 2014, Erbey owned approximately 27% of all outstanding shares of AAMC.

savings bank, Ocwen left the thrift business in 2005, thereby allowing it to shed minimum capital requirements along with oversight from the Office of Thrift Supervision. Ocwen then began purchasing MSRs and MSR-holding entities.

26. As the global financial crisis of 2008 unfolded, financial institutions incurred heavy, firm-destroying losses on subprime mortgages. Facing these mounting financial losses along with regulatory reforms from the newly-formed Consumer Financial Protection Bureau ("CFPB"),[7] banks like JPMorgan Chase, Bank of America, Wells Fargo, and Citigroup fled the servicing business. As banks attempted to divest and distance themselves from these questionable, low-quality mortgages, Erbey pounced and directed Ocwen to begin purchasing subprime and Alt-A MSRs and MSR-holding entities on an unprecedented scale.

27. Ocwen pursued its rapid expansion by acquiring entire companies and MSRs from 2010 to 2013:

[7] Bank of America, Citigroup, JPMorgan Chase, Wells Fargo, and Ally Financial were among the banks whose practices were the focus of the Consumer Financial Protection Bureau when they were required to accept the terms of the National Mortgage Settlement. These terms included provisions requiring consumer relief and refinance assistance for borrowers.

| Acquisition | Year | Loan Count | UPB $ Value |
|---|---|---|---|
| Saxon Mortgage Services | 2010 | 170,000 | $29.1 billion |
| HomEq Servicing | 2010 | 134,000 | $22.4 billion |
| Litton Loan Servicing LP | 2011 | 245,000 | $38.6 billion |
| MSRs from Bank of America | 2012 | 51,000 | $10.1 billion |
| Homeward Residential Holdings, Inc. | 2012 | 421,000 | $77 billion |
| Residential Capital LLC | 2012 | 1,740,000 | $183.1 billion |
| MSRs of JP Morgan Chase | 2012 | 41,200 | $8.1 billion |
| MSRs of OneWest Bank FSB | 2013 | 299,000 | $69 billion |
| MSRs of Ally Bank | 2013 | 466,900 | $87.5 billion |
| MSRs of Greenpoint | 2013 | 31,400 | $6.3 billion |
| | | **Total Loan Count**[1] **2,861,918** | **Total UPB**[2] **$464.7 billion** |

(1) Residential loan count, excluding commercial loans, as reported by Ocwen for the period ended December 31, 2013.

(2) Residential Unpaid Principal Balance ("UPB"), excluding commercial loans, as reported by Ocwen for the period ended December 31, 2013.

28. By the end of 2013, Ocwen had grown its portfolio to nearly three million residential loans, with a total value of $464.7 billion. These acquisitions transformed Ocwen from the 12th largest servicer in the United States into the 4th largest servicer and grew its market share 350% from 2011 to 2014, making it the largest non-bank servicer in the country.

29. Due in part to the massive influx of loans acquired from Homeward and ResCap, Ocwen proclaimed that it intended to integrate the servicing platforms of its acquisitions onto a proprietary servicing platform called REALServicing, which could provide high-quality servicing at 70% less cost than its competitors, while being fully scalable. REALServicing was a

platform owned by Altisource (which had been spun off from Ocwen in 2009 as another purportedly separate public company) and leased by Ocwen. Altisource, however, like other Ocwen spinoffs, shared employees with Ocwen, and Defendant Erbey owned a significant stake in and acted as Chairman for each of these companies during the Class Period. As of December 31, 2013, Defendant Erbey owned 13% of Ocwen's shares and 26% of Altisource's outstanding shares. All of these vertically integrated companies owned partially by Defendant Erbey derive most, if not all, of their revenue from Ocwen's servicing activities and/or foreclosures resulting from delinquent loans:




30. The clear connection between the Ocwen spinoffs can be illustrated as follows: if Ocwen determines to foreclose on a delinquent loan (a decision made by software provided by

Altisource), Altisource would handle the foreclosure listing through an online realty company called Hubzu, in which Defendant Erbey also owns a stake. Hubzu sold 25,000 homes in foreclosure in 2012. Altisource may convert some foreclosed homes into rental properties to be leased out by RESI, another Ocwen-related company in which Defendant Erbey owned 5% of the outstanding shares. AAMC, in which Defendant Erbey owned a 27% interest, acts as RESI's asset manager for rented properties under management. HLSS buys assets from Ocwen and leases them back to Ocwen to reduce the Company's capital carry. Defendant Erbey also owned a 1% stake in HLSS's publicly traded shares.

**C. Defendant Erbey's Role In HLSS And The Ocwen Complex**

31. Destroying any reasonable notion of what an "independent" company is, Erbey simultaneously served as chairman of HLSS, Ocwen, Altisource, RESI, and AAMC, exercising near-dictatorial control over the entire Ocwen complex. While nominally independent, these companies were little more than alter-ego, shell game facades designed to enrich Erbey to the tune of billions of dollars on the backs of struggling homeowners. Indeed, in an October 23, 2013 article entitled "Bill Erbey Made $2.3B Off Your Underwater Mortgage," investor website thestreet.com observed that "[w]hile Erbey is chairman of five companies and CEO of none, followers of the five companies say he has the last word on all important decisions."

32. As thestreet.com stated: "Home Loan Servicing Solutions and Altisource Asset Management (AAMC) do not conform to the man-on-the-street notion of a company. Legal structures might be a better way to describe them." Despite managing a portfolio purportedly worth over $4.3 billion in unpaid principal balance ("UPB"), HLSS consistently reported having only a handful of employees, including 14 employees in the Company's 2012 Form 10-K, and 18 employees in its 2013 Form 10-K. As was the case in all other Ocwen-related companies, Erbey was deeply involved in the formation and management of HLSS, contributing $10 million of his

own money to the initial capitalization of HLSS in a private placement round, which equated to 3.5% of all HLSS shares. Further, Erbey and the other directors of HLSS held large amounts of shares in the related companies, which further incentivized Defendants to contain all transactions within the Ocwen complex.

33. Making matters even worse, HLSS's executives also came directly from Ocwen. Erbey was the beneficial owner of approximately 13% of Ocwen's common stock as of June 30, 2012. Richard Delgado, Treasurer of HLSS, owned 12,291 shares of Ocwen common stock. In addition, the Ocwen Board of Directors extended the post-termination exercise period of options to purchase 625,000 shares of Ocwen common stock held by Defendant Van Vlack, 90,197 shares of Ocwen common stock held by Delgado and 20,000 shares of Ocwen common stock held by HLSS General Counsel Michael J. McElroy in connection with their resignation from their positions at Ocwen at the time of the closing of HLSS's IPO. The NYDFS's February 2014 Letter demanded further information on this specifically, stating that management's ownership of "stock or stock options in the affiliated companies" "raises the possibility that management has the opportunity and incentive to make decisions" favorable to the affiliated companies.

34. In addition to having the same Chairman and management, HLSS also utilized the same servicing platform, facilities, and operational features as Ocwen. As detailed below, HLSS's use of Ocwen's faulty data systems—of which faults Defendants were aware at all relevant times—caused the improper valuation of notes receivable, which required HLSS to restate all financial statements for the fiscal years ended December 31, 2012 and 2013 and all quarterly periods within.[8]

---

[8] Under the terms of the Professional Services Agreement, Ocwen was responsible for valuation analyses. In responding to a SEC Comment Letter dated December 7, 2014, HLSS confirmed that Ocwen's systems were the cause of data input errors leading to the restatement.

35. Given Erbey's direct control over the related companies, and the fact that Lauter and Van Vlack came directly from Ocwen, where they held management positions, the Individual Defendants had detailed knowledge of the ongoing misconduct occurring at Ocwen. Defendant Van Vlack was formerly an Executive Vice President, the CFO, and the Chief Accounting Officer of Ocwen. Defendant Van Vlack's duties specifically included overseeing Ocwen's servicing business, directing Ocwen's Advance Financing Facility ("Advance Facility")—a mechanism that securitizes funds used to cover late payments on mortgages, insurance and other measures taken to protect an asset[9]—and managing aspects of its portfolio. Defendant Lauter, a former VP of Finance at Ocwen, also directed Ocwen's Advance Facility. Despite the Individual Defendants' intimate familiarity with the Ocwen complex dynamic, Defendants misrepresented and omitted material information concerning the HLSS-Ocwen relationship throughout the Class Period. For instance, when asked about the NYDFS's MSR freeze over concerns about the HLSS-Ocwen relationship during the Company's earnings call for the first quarter of 2014, Erbey told investors that the freeze on MSR deals "relate[d] only to Ocwen." In truth, the freeze and other events concerning the Ocwen and HLSS misconduct were

[9] Servicers make "advances," which are funds used to cover late payments on mortgages, insurance, and other measures taken to protect the asset. Equally important, while servicing advances provide liquidity to mortgage servicing transactions and assets, funding a large amount of advances inevitably strains the liquidity of a servicer. Servicers, including Ocwen, circumvented this problem by securitizing the advances through Advance Financing Facilities ("Advance Facilities"). Specifically with respect to Ocwen, Ocwen pooled its advance payments, transferred them to a Special Purpose Entity, and issued notes (debt) against them. This allowed Ocwen to garner funds up front, which it used to service payments to investors in the securitized mortgages. While highly engineered, this practice is no different than an individual opening one credit card to pay off another. A servicer does not derive profits when a home is foreclosed upon or when it is fully paid off; rather a servicer profits by servicing a pool of constantly operating mortgages. Erbey and Ocwen knew this, and heavily utilized the Advance Facilities strategy to cut costs and maximize profits for as long as possible, creating at least four Advance Facilities prior to 2009.

material and vital to the Company's business. In actuality HLSS was just a pawn in the Ocwen fraudulent scheme, which was directed by Erbey and the Individual Defendants.

### D. Defendants Materially Misrepresented—And Actively Concealed—The True Nature Of The Relationship Between HLSS And Ocwen

36. HLSS was dependent on Ocwen, relying on Ocwen for nearly every single aspect of its business. Prior to the New Residential transaction, all of HLSS's assets and revenues were either acquired from, or serviced by, Ocwen.

37. HLSS was fully reliant on Ocwen and Altisource in critical areas such as asset valuation and regulatory compliance, and those entities' failures severely impacted HLSS. Ocwen admitted in the 2014 Consent Order that its platform was "inadequate" and nothing more than a disjointed "patchwork of legacy systems and systems inherited from acquired companies," and that "Ocwen's core servicing functions rely on its inadequate systems." Numerous violations during the Class Period made it clear that Ocwen's REALServicing platform was deficient. Even though it had access to other servicing systems, Ocwen chose to operate REALServicing to cut costs. This impacted HLSS's core business, ultimately requiring a last-minute asset sale to New Residential to secure funding.

38. Through the HLSS-Ocwen arrangement, HLSS became obligated to fund massive amounts of servicing advances for Ocwen, which benefitted Ocwen by allowing it to keep earning fees while simultaneously jettisoning responsibility for the advances. In short, HLSS could not exist without a steady stream of assets from Ocwen. Despite this financial engineering, the HLSS-Ocwen relationship was relatively simple: the true purpose of this arrangement was to route Ocwen's servicing revenue through an offshore tax haven via HLSS, allow Ocwen to unload assets on paper yet still collect the associated fees, and sustain the cycle by monetizing advances and using the proceeds to fund even more purchases. From a servicing

perspective, although Ocwen was styled a "subservicer," it seamlessly continued its business, replete with its demonstrably illegal and fraudulent behavior. In truth, HLSS's business consisted of nothing more than owning the rights to Ocwen's mortgage rights—which amounted to a rinsing of its servicing profits through a tax haven—and taking on Ocwen's responsibility to fund servicing advances, to the detriment of HLSS and its shareholders.

39. Because HLSS was entirely dependent on Ocwen, Ocwen's violation of consent orders, settlements, state and federal law, and the Sixth Amended and Restated Indenture materially jeopardized HLSS's business. Ocwen's illegal behavior was highly material because HLSS's main assets—Rights to MSRs and servicing advances—are fully contingent on Ocwen's servicing ability, which Defendants knew was entirely inadequate. Indeed, Ocwen was so derelict in its servicing practices that it was being pursued by a concert of regulators and authorities, which impaired its ability to service the mortgages that kept HLSS in business.

## E. Erbey And Ocwen Serially Violate The Law

### 1. The NYDFS Scrutinizes Ocwen's Illicit Practices

40. Because of Ocwen's fatally deficient compliance and control procedures, it soon found itself under the spotlight of intense regulatory scrutiny. The NYDFS first expressed concern that Ocwen's growth was occurring at the expense of borrowers in 2011, when the Company announced its intention to acquire Litton Loan Servicing LP from Goldman Sachs. To satisfy the NYDFS' concerns, Ocwen entered into the Agreement on Mortgage Servicing Practices on September 1, 2011 with the NYDFS (the "AMSP"), which required it to, among other things, perform independent reviews of loan modification requests, avoid foreclosures, and

avoid utilizing force-placed insurance unless reasonably priced and not acquired from a related entity.[10]

41. The AMSP was meant to ensure that Ocwen's growth would not harm homeowners. NYDFS Superintendent Lawsky stated that the agreement "sets a new higher standard for the residential mortgage servicing industry, whose troubling foreclosure and servicing practices we have been investigating along with other regulators across the country." Only by accepting the terms of the AMSP was Ocwen able to continue to buy MSRs for 221,000 loans from JP Morgan, Bank of America and Saxon. The Litton acquisition would not have taken place without the AMSP.

42. However, NYDFS examiners soon found that Ocwen was in violation of the AMSP's terms and requirements,[11] and only a year later, Ocwen was forced to enter into another agreement with the NYDFS, titled the "Consent Order Under New York Banking Law § 44" (the "2012 Consent Order"). Pursuant to the terms of the 2012 Consent Order, the NYDFS installed a compliance monitor (the "Compliance Monitor") who was tasked with conducting "a comprehensive review . . . of Ocwen's servicing operations, including its compliance program and operational policies and procedures," so that it "can be sure that the reforms are implemented and homeowners have a real chance to avoid foreclosure."

43. Ocwen's mortgage misconduct continued unabated in spite of the two NYDFS orders and the Compliance Monitor it installed. Ocwen, among other troubling acts and practices, would give false or misleading reasons for denying loan modifications to borrowers,

---

[10] http://www.dfs.ny.gov/insurance/press/p1109011.htm

[11] In June 2012, committed to ensuring that Ocwen was engaged in proper practices, Lawsky dispatched examiners to conduct surprise visits at Ocwen's offices in Houston and West Palm Beach. Examiners started "seeing things immediately," indicating that "[t]he Company had not lived up to the agreement." http://www.bloomberg.com/news/2014-10-22/ocwen-s-backdated-letters-may-violate-consent-order.html

failed to honor pending modifications on transferred loans, failed to notify borrowers of their rights regarding modifications and other assistance, improperly described loss mitigations, charged unauthorized fees, failed to process paperwork on time, failed to inform borrowers of foreclosure proceedings on a good-faith basis, filed false and misleading documents with courts and government agencies, and fraudulently authenticated thousands of foreclosures without even a cursory review of the paperwork, a practice known as "robo-signing." For this misconduct, Ocwen agreed to enter into a massive $2.2 billion settlement with the CFPB and 49 states' attorneys general on December 19, 2013. The CFPB also revealed that the Federal Trade Commission ("FTC") had been investigating Ocwen, and had transferred the case to the CFPB upon that agency's formation. In addition to paying a monetary settlement, Ocwen once again promised to cease its illegal practices and maintain sufficient internal controls to prevent them from recurring. The Director of the CFPB, Richard Cordray, flatly stated that "Ocwen violated federal consumer financial laws at every stage of the mortgage servicing process."[12] Cordray went on to explain that because of the violations, "Ocwen made troubled borrowers even more vulnerable to foreclosure."

44. Nevertheless, Ocwen's utter disregard of the law continued unabated throughout 2014. On January 22, 2014, Ocwen attempted to acquire $39 billion worth of MSRs from Wells Fargo. A mere two weeks after its announcement, on February 6, 2014, the NYDFS "put an indefinite hold" on the massive Wells Fargo loan acquisition pending the Monitor's review of Ocwen's compliance.

---

[12] Nathaniel Popper, THE NEW YORK TIMES, "Subprime Mortgage Loan Servicer Ocwen Agrees to $2.2 Billion Settlement," DealBook, December 19, 2013, *available at* http://dealbook.nytimes.com/2013/12/19/big-mortgage-servicer-reaches-settlement/ (last accessed June 7, 2015).

### 2. The NYDFS Investigation Of Ocwen Leads To A Series Of Revelations Concerning The Misconduct In The Ocwen Complex

45. On February 26, 2014, the NYDFS issued a letter (the "February 2014 Letter") stating that the NYDFS "***uncovered a number of potential conflicts of interest between Ocwen and other public companies with which Ocwen is closely affiliated***," listing HLSS as one of the "affiliated companies." The NYDFS's investigation raised "***serious doubts on recent public statements made by the company that Ocwen has a 'strictly arms-length business relationship' with those companies***." Further, the NYDFS stated that the decisions concerning Ocwen were ***"intended to benefit the share price of affiliated companies, resulting in harm to borrowers, mortgage investors, or Ocwen shareholders as a result***."

46. The February 2014 Letter focused on Erbey, stating that he was the largest shareholder of each affiliated company (including HLSS). Moreover, the NYDFS discovered that S.P. Ravi, Ocwen's Chief Risk Officer, was also Chief Risk Officer at Altisource—a clear conflict of interest. The NYDFS revealed that Ravi "***seemed not to appreciate the potential conflicts of interest posed by this dual role, which was particularly alarming given his role as Chief Risk Officer***."[13] Even more alarming was the fact that Ocwen paid his entire salary, making it unclear whether Altisource paid any compensation for its Chief Risk Officer's services. Notably, Ravi "***reported directly to Mr. Erbey in both capacities***."

47. Ultimately, as part of the 2014 Consent Order, Ocwen admitted to the impropriety of employing Ravi as its Chief Risk Officer while he also served as Altisource's Chief Risk

[13] A company's "chief risk officer" is generally tasked with identifying, analyzing, and mitigating circumstances that can threaten a company. A chief risk officer must work to (i) ensure that a company is in compliance with, among other things, government regulations and (ii) develop internal controls to identify and prevent areas of risk, including compliance and regulatory issues. Thus, the role played by Ocwen's Chief Risk Officer—to protect against areas of risk and ensure the quality of Ocwen's systems—created a serious conflict of interests with Altisource.

Officer. Ocwen also agreed that it "will not share any common officers or employees with any related party," signifying that Ravi's co-employment had not been an isolated incident.

48. On April 21, 2014, the NYDFS issued another letter (the "April 2014 Letter") that exposed an arrangement that subjected homeowners whose loans were serviced by Ocwen and foreclosed upon by Altisource to fees three times greater than those charged to non-Ocwen customers. The April 2014 letter "***raised concerns surrounding conflicted business relationships***" that "***negatively impact[] homeowners and mortgage investors***." Specifically, the April 2014 letter was in regards to "***self-dealing***" between Ocwen and Altisource, in regards to Altisource's subsidiary, Hubzu, which Ocwen used as its principal online auction site for the sale of its borrowers' homes facing foreclosure and investor-owned properties following foreclosure. Contrary to representations that Altisource charged Ocwen customers "market rates," the conflicted business relationship between the companies allowed Altisource to charge auction fees for Hubzu "that are up to three times the fees charged to non-Ocwen customers."

49. This overcharging of Ocwen-serviced businesses on Hubzu had a significant impact. These higher fees were passed on to struggling borrowers who were, according to the NYDFS, "trying to mitigate losses and are not involved in the selection of Hubzu as the host site." Thus, because Ocwen used Hubzu as its principal online portal for selling borrowers' homes facing foreclosure and the majority of properties listed on Hubzu were being serviced by Ocwen, this self-dealing arrangement benefited Altisource and Erbey at the direct expense of numerous Ocwen-serviced borrowers. Significantly, Ocwen admitted to this over-charging in the 2014 Consent Order, stating: "[i]n certain circumstances, Hubzu has charged more for its services to Ocwen then to other customers - charges which are then passed on to borrowers and investors."

50. On May 20, 2014, in a speech to the Mortgage Bankers Association, NYDFS Superintendent Lawsky provided greater detail regarding the threat posed to borrowers by Ocwen's conflicts of interest. Lawsky stated that its "review of non-bank servicers has also turned up another enormous profit center associated with these MSRs [Mortgage Servicing Rights] that could put homeowners and mortgage investors at risk: the provision of what we call ancillary services" whereby "an affiliate provides fee-based services for every single step in the real estate process." As Lawsky explained, this provision of services poses a threat to consumers because "there effectively is no customer to select its vendor for ancillary services. Non-bank servicers have a captive (and often confused) consumer in the homeowner." Lawsky stated that "***the potential for conflicts of interest and self-dealing are perfectly clear. Servicers have every incentive to use these affiliated companies exclusively for their ancillary services, and they often do. The affiliated companies have every incentive to provide low-quality services for high fees, and they appear in some cases to be doing so***."[14] Lawsky concluded his speech with a representation that the market "should expect [the NYDFS] to expand our investigation into ancillary services in the coming weeks and months."

51. On August 4, 2014, the NYDFS issued another letter (the "August 2014 Letter") regarding additional related-party transactions at Ocwen that were unfair to homeowners, in particular that $65 million in fees annually were being funneled from already-distressed homeowners to Altisource for minimal work. The August 2014 letter expressed concern regarding Ocwen's "troubling" arrangement with related company Altisource in connection with

[14] News articles reporting on the speech published that same day, understood that Lawsky's May 20, 2014 speech was directed, at least in part, toward the relationship between Altisource and Ocwen. *HousingWire* stated that Lawsky was referring to Ocwen and Altisource when he addressed how servicers benefit from having related parties provide the ancillary services. *Mortgage Daily* also made the connection between Lawsky's speech and Ocwen and Altisource, as providers of ancillary services that Lawsky has been investigating.

the provision of force-placed insurance to customers. In the August 2014 letter, the NYDFS reiterated that its "concerns about Ocwen's use of related companies to provide fee-based services such as property inspections, online auction sites, foreclosure sales, real estate brokers, debt collection, and many others." The NYDFS added in the August 2014 letter that "[b]ecause mortgage servicing presents the extraordinary circumstance where there is effectively no customer to select a vendor for ancillary services, Ocwen's use of related companies to provide such services raises concerns about whether such transactions are fairly priced and conducted at arms-length." The NYDFS expressed concern that "***non-bank mortgage servicers are seeking to side-step…borrower protections through complex arrangements with subsidiaries and affiliated companies***."

52. Specifically, the August 2014 Letter detailed an example of how Defendant Erbey played a primary role in negotiating and approving a sweetheart deal between Ocwen, Altisource and a third-party insurance agent, SWBC, that would improperly funnel $65 million annually to Altisource in exchange for minimal work, while concealing Altisource's role in the provision of the insurance. The August 2014 Letter described Ocwen's "force-placed arrangement with Altisource" as "not presented for review or approval to any member of the Ocwen Board of Directors, ***except Mr. Erbey***." The August 2014 Letter noted that Ocwen disregarded the concerns regarding the "multiple roles played by Mr. Erbey" as "Ocwen proceeded to execute contracts formalizing this new force-placed arrangement, apparently without further consideration by any Board member other than Mr. Erbey." The August 2014 letter stated that the NYDFS and its Monitor "***uncovered a growing body of evidence that Mr. Erbey has approved a number of transactions with the related companies, despite Ocwen's and***

***Altisource's public claims – including in SEC filings – that he recuses himself from decisions involving related companies***."[15]

53. On August 12, 2014, Ocwen disclosed additional problems with its business and operations, announcing that it would be restating financial results for the fiscal year ended December 31, 2013 and the quarter ended March 31, 2014 as a result of transactions with HLSS. Ocwen stated that "[t]he changes we are contemplating principally relate to the valuation methodology of our Financing Liability – MSRs pledged ***in connection with certain rights to receive servicing fees, excluding ancillary income, with respect to certain mortgage servicing rights ("Rights to MSRs"), a Level 3 asset, sold to a third party, Home Loan Servicing Solutions, Ltd. ("HLSS")***."

54. On August 18, 2014, Ocwen disclosed that it had received a subpoena from the SEC over a month earlier, on June 12, 2014, "requesting production of various documents related to our business dealings with Altisource, HLSS, AAMC and [RESI] and the interests of our directors and executive officers in these companies."[16]

55. Ocwen's violations continued, and in an October 21, 2014 letter (the "October 2014 letter"), the NYDFS revealed that Ocwen was backdating letters in order to prevent

[15] For instance, in its 2013 Form 10-K, Ocwen stated that because Defendant Erbey's "ownership interests could create, appear to create or be alleged to create conflicts of interest with respect to matters potentially or actually involving or affecting [Ocwen] and Altisource, HLSS, AAMC and Residential," the Company has: "adopted policies, procedures and practices to avoid potential conflicts with respect to [its] dealings with Altisource, HLSS, AAMC and Residential, ***including our Executive Chairman [Erbey] recusing himself from negotiations regarding, and approvals of, transactions with these entities. We also manage potential conflicts of interest through oversight by independent members of our Board of Directors*** (independent directors constitute a majority of our Board of Directors), and we will seek to manage these potential conflicts through dispute resolution and other provisions of our agreements with Altisource, HLSS, AAMC and Residential.

[16] *See* http://www.housingwire.com/articles/31083-sec-subpoenas-ocwen-over-business-dealings

borrowers from receiving modification benefits and avoiding late fees."[17] Ocwen admitted that it had become aware of the issue in November 2013 – but only after Ocwen attempted to mislead the NYDFS about its knowledge and the severity of the problems. Specifically, on June 19, 2014, the NYDFS monitor demanded an explanation after uncovering an Ocwen denial letter that was dated June 14, 2012, but not sent to the borrower until well over one month later on July 25, 2012. At first, Ocwen told the Compliance Monitor that (i) the backdating problem affected only 6,100 letters; (ii) the problem had been discovered and resolved by Ocwen in April or May 2014; and (iii) Ocwen implemented changes to its systems in May 2014 that resolved the problem.

56. As described in the October 2014 Letter, the NYDFS determined that "[e]ach of these representations turned out to be false." The NYDFS concluded that the 6,100 letters were only "a fraction" of the total backdated letters that could ultimately number in the "hundreds of thousands." Then, following "persistent questioning," Ocwen admitted that it actually knew of the backdating issue eight months earlier. Specifically, Ocwen admitted that in November 2013, an employee informed senior management, including the Company's Vice President of Compliance, of the backdating issue, but neither Ocwen nor the Vice President of Compliance did anything to address the problem. Even as of the date of the 2014 Consent Order, Ocwen had failed to fully resolve the issue.

57. In the October 2014 Letter, the NYDFS expressed concern that "[t]he existence and pervasiveness of these issues raise critical questions about Ocwen's ability to perform its core function of servicing loans." The NYDFS concluded that "[t]he stakes for borrowers and investors are enormous. If the Department concludes that it cannot trust Ocwen's systems and

---

[17] NYDFS, Letter from Benjamin Lawsky to Ocwen Financial Corporation, October 21, 2014, *available at* http://www.dfs.ny.gov/about/press2014/pr141021-ltr.pdf (last accessed June 7, 2015).

processes, then it cannot trust Ocwen is complying with the law. If Ocwen cannot demonstrate immediately that it is capable of properly servicing borrowers' needs, the Department intends to take whatever action is necessary to ensure borrowers are protected."

58. That same day, Ocwen issued a press release attempting to minimize the scope and severity of the backdating problem. In particular, Ocwen represented that the issue was "inadvertent," limited to only "283 borrowers in New York" and had been fully resolved. However, after the market closed that day, Ocwen issued a second press release retracting the above statement and admitted that the problem was larger in scope than just 283 borrowers. The second press release stated that Ocwen was aware of "additional borrowers in New York who received letters with incorrect dates" but could not quantify the scope of the problem.

59. On December 12, 2014, dsnews.com reported that Joseph Smith, Jr., the Monitor of the National Mortgage Settlement, witnessed "serious deficiencies in Ocwen's internal review group process."

60. On December 22, 2014 Ocwen made a stunning announcement that it had entered into another consent order (the "2014 Consent Order") with the NYDFS concerning its wrongful mortgage servicing practices, and that Erbey would be resigning from his position as Executive Chairman of Ocwen and from his positions on the Board at Altisource, AAMC, RESI and HLSS. The terms of the 2014 Consent Order required Ocwen to pay a $100 million penalty and an additional $50 million in restitution to struggling homeowners. Significantly, Ocwen was also required to expand its Board by two independent directors, who were prohibited from owing any equity in any company in the Ocwen complex. Ocwen admitted the following facts, among others, in the 2014 Consent Order:

> a. The Monitor's review of 478 loans serviced by Ocwen that had been foreclosed upon "revealed ***1,358 violations of Ocwen's legal obligations***, or

about three violations per foreclosed loan," including "failing to confirm that it had the right to foreclose before initiating foreclosure proceedings," "failing to ensure that its statements to the court in foreclosure proceedings were correct," and "pursuing foreclosure even while modification applications were pending";

b. "Ocwen's information technology systems are a patchwork of legacy systems and systems inherited from acquired companies," and, "[a]s a result, ***Ocwen regularly gives borrowers incorrect or outdated information, sends borrowers backdated letters, unreliably tracks data for investors, and maintains inaccurate records***";

c. "Ocwen's systems ***have been backdating letters for years,*** " and its "processes failed to identify and remedy these errors";

d. "Ocwen failed to fully investigate and appropriately address the backdating issue when an employee questioned the accuracy of Ocwen's letter dating processes and alerted the company's Vice President of Compliance," and "ignored the issue for five months until the same employee raised it again";

e. "Ocwen has not fully resolved the [backdating] issue to date, more than a year after its initial discovery";

f. "Ocwen's core servicing functions rely on its inadequate systems";

g. REALServicing relies on "an unnecessarily complex system of comment codes," including "more than 8,400" comment codes, "duplicate codes that perform the same function," and "50 different codes for the single function of assigning a struggling borrower a designated customer care representative";

h. "Ocwen's reliance on technology has led it to employ fewer trained personnel than its competitors," and according to Ocwen's Chief Financial Officer, "Ocwen [was] simply 'training people to read the scripts and the dialogue engines with feeling.'" throughout all relevant times;

i. "Ocwen penalizes and has terminated customer support staff who fail to follow the scripts that appear on their computer screens" – a policy which "frustrated struggling borrowers who have complex issues that exceed the bounds of a script" and led to customer support staff "provid[ing] conflicting responses to a borrower's question";

j. Ocwen "failed in many cases to record in Ocwen's servicing system the nature of the concerns that a borrower has expressed, leading to inaccurate records of the issues raised by the borrower";

k. "Ocwen's inadequate infrastructure and ineffective personnel have resulted in Ocwen's failure to fulfill its legal obligations," and "[p]rior to the [DFS] review, Ocwen did not take adequate steps to implement the reforms that it was legally obligated to implement pursuant to the AMSP";

> l. Defendant Erbey and other Ocwen executives and directors "own significant investments in both Ocwen and the related parties," but "Ocwen does not have a written policy that explicitly requires potentially conflicted employees, officers, or directors to recuse themselves from involvement in transactions with the related companies";
>
> m. "Mr. Erbey has not in fact recused himself from approvals of several transactions with related parties," and instead "has participated in the approval of a number of transactions between [Ocwen and Altisource] or from which Altisource received some benefit, including the renewal of Ocwen's force[] placed insurance program in early 2014";
>
> n. "Hubzu has charged more for its services to Ocwen than to other customers –charges which are then passed on to borrowers and investors"; and
>
> o. "Ocwen's Chief Risk Officer concurrently served as the Chief Risk Officer of Altisource" and "reported directly to Mr. Erbey in both capacities."

61. On December 26, 2014, Morningstar analysts stated that "The real cost of compliance with the terms will undoubtedly be greater than the $150 million stated in the settlement and is likely to slow or altogether halt any long-term growth for Ocwen[.]"

**3. The CDBO Consent Order Against Ocwen**

62. In January 2015, Ocwen was forced to pay $2.5 million and accept an independent auditor imposed by the CDBO, who reported directly to the CDBO, in response to the California Department of Business Oversight, which threatened to suspend Ocwen's license to operate in California. According to the CDBO, Ocwen failed to comply with requests for information, failed to comply with a subpoena, "violated a lawful order from the commissioner," and "failed to comply with an order from an administrative law judge."

63. The CDBO consent order: (1) prohibits Ocwen from acquiring additional MSRs for loans secured by properties in California until the CDBO "is satisfied that Ocwen can satisfactorily respond to the requests for information and documentation made in the course of a regulatory exam[;]" (2) provides for the CDBO's appointment of an independent third-party auditor to assess the Company's compliance with state and federal laws and regulations; (3)

entitles the CDBO to pursue an enforcement action against Ocwen based upon any violations that the auditor may discover during its review; and (4) required Ocwen to pay a penalty in the amount of $2.5 million.

64. Also in January 2015, Ocwen received notices of non-performance from a group of its investors including BlackRock, MetLife, and Pimco, stating that independent, highly qualified experts had determined that Ocwen "failed to perform, in material respects, its contractual obligations as servicer and/or master servicer." The investors identified many of the critical deficiencies that remained at Ocwen: conflicted relationships with related companies (including HLSS), improper servicing practicing, failure to maintain adequate records, and failure to have proper financial controls.

65. Consumer complaints against Ocwen continue to pour in. Local, state, and national news outlets have published stories of everyday borrowers who suffered greatly and even lost their homes due to Ocwen's willful misconduct. In addition to the instant action against HLSS, other shareholder actions, including securities fraud class actions, have been filed against Erbey, Ocwen, and the other companies involved in the Ocwen complex.

### 4. The HLSS Facade Begins To Crumble

66. On August 18, 2014, HLSS announced that the Company would be restating its financials for the fiscal years 2012 and 2013, and all quarterly periods therein, and for Q1 of 2014. The Company noted that the "errors relating to the valuation of our Notes Receivable constituted a material weakness in our internal control over financial reporting" because the valuation methods did not comply with GAAP.

67. On September 15, 2014, according to HLSS, "the Company received a subpoena from the SEC requesting that it provide certain information related to the Company's prior

accounting conventions for and valuations of its Notes receivable – Rights to MSRs that resulted in the restatement of the Company's consolidated financial statements for the years ended December 31, 2013 and 2012 and for the quarter ended March 31, 2014 during August 2014."

68. Shortly thereafter, the Erbey-directed fraudulent scheme prevalent throughout HLSS and the entire Ocwen complex came crashing down, resulting in massive losses to the Company's shareholders.

## V. THE TRUTH BEGINS TO EMERGE

69. Beginning in October 2014, a series of disclosures exposed the illicit practices running rampant throughout HLSS and the rest of the Ocwen complex. These disclosures resulted in massive declines in the Company's stock price, analyst and credit rating downgrades, and regulatory actions. The revelations concerning HLSS's underlying problems left the Company scrambling to salvage itself, unable to even satisfy merger conditions with New Residential, and eventually succumbing to an asset sale made without shareholder approval.

70. On October 21, 2014, the NYDFS released a letter exposing its findings regarding "serious issues with Ocwen's systems and processes, including Ocwen's backdating of potentially hundreds of thousands of letters to borrowers, likely causing them significant harm." The October 2014 letter explained that "[i]n many cases, borrowers received a letter denying a mortgage loan modification, and the letter was dated more than 30 days prior to the date that Ocwen mailed the letter." It went on to state that "[i]n other cases, Ocwen's systems show that borrowers facing foreclosure received letters with a date by which to cure their default and avoid foreclosure – and the cure date was months prior to the receipt of the letter." Even worse, Ocwen apparently "did nothing to investigate or address the issue" when an employee alerted Ocwen's Vice President of Compliance. The letter noted that Ocwen claimed to have discovered and fixed this problem on its own in May of 2014, but later admitted in a September 2014

memorandum that it actually had fixed nothing and that its May 2014 statements to that effect were false. The letter also addressed Ocwen's culture of noncompliance, stating that "inconsistencies in Ocwen's servicing system call into question the accuracy and reliability of Ocwen's recordkeeping," and "we are directing the Monitor to share its findings with Ocwen so that Ocwen may better understand the severe nature of its own problems." The letter concluded that the "***stakes for borrowers and investors are enormous***."

71. After the close of the financial markets on October 21, 2014, and in reaction to the shocking NYDFS disclosures, Moody's downgraded HLSS and several other Ocwen-related entities. In announcing the downgrade, Moody's noted that Lawsky's letter to Ocwen raised "serious issues with Ocwen's servicing systems and processes. These allegations raise the risk of actions that restrict Ocwen's activities, the levying of monetary fines against Ocwen, or additional actions that negatively affect Ocwen's credit strength. In addition, the continued regulatory scrutiny further damages Ocwen's franchise position." Significantly, Moody's noted that the HLSS credit rating is driven in large part by the reliance of HLSS on Ocwen. Moody's added in its ratings rationale that "negative ratings pressure on HLSS's ratings could result if the [C]ompany's financial fundamentals weaken, with particular focus on: a) adequate funding availability and b) financial leverage." Moody's was not the only firm to see the direct link between Ocwen and HLSS. Analysts and reporters also directly attributed the HLSS decline to the release of the NYDFS letter.[18]

---

[18] "Ocwen family tumbles as Lawsky targets backdating," *Seeking Alpha*, available at http://seekingalpha.com/news/2044955-ocwen-family-tumbles-as-lawsky-targets-backdating; "Ocwen Dives on N.Y. Claims It Backdated Documents," *Investor's Business Daily*, available at http://news.investors.com/102114-722765-ocwen-financial-accused-of-backdating-documents.htm?ven=yahoocp&src=aurlled&ven=yahoo.

72. HLSS's stock price fell $2.92 per share or 13.4% from $21.82 per share on October 20, 2014 to $18.90 per share on October 22, 2014—wiping out over $200 million in market capitalization.

73. On October 23, 2014, Compass Point also downgraded HLSS from Buy to Neutral with a price target of $18.00 "based on the increased risk to HLSS's revenue and assets tied to the Ocwen . . . servicing relationship."

74. Approximately two months later, on December 22, 2014,[19] the NYDFS announced that it had entered into a sweeping consent order with Ocwen, based on its ongoing investigation into the Company. Ocwen ***admitted*** to "numerous and significant violations of New York State laws and regulations," engaging in "repeated non-compliance" of prior regulatory orders. In addition, Ocwen ***admitted to*** "providing borrowers "incorrect or outdated information", sending borrowers "backdated letters", "maintain[ing] inaccurate records", having "insufficient controls", "employ[ing] fewer trained personnel than its competitors", and having "[an] inadequate infrastructure and ineffective personnel [that has] resulted in Ocwen's failure to fulfill its legal obligations." In the 2014 Consent Order, the NYDFS stated that Ocwen had "(a) inadequate and ineffective information technology systems and personnel, and (b) widespread conflicts of interest with related parties."

75. In regards to the conflicts of interest, the NYDFS "uncovered a number of conflicts of interest" between HLSS, Ocwen and the three other Erbey-controlled Ocwen complex companies, and that Erbey improperly operated this corporate web with "widespread conflicts of interests" and engaged in self-dealing transactions designed to enrich Erbey.

---

[19] Also on December 22, 2014, the Company received a subpoena from the SEC requesting that it "provide information related to certain governance documents and transactions and certain communications regarding the same."

Specifically, the 2014 Consent Order described how Erbey, with over $1 billion in holdings across all of the related parties, is the largest individual shareholder of each related party, as well as the chairman of each board. Moreover, "[o]ther Ocwen executives and directors also own significant investments in Ocwen and the related parties. Yet, Ocwen does not have a written policy that explicitly requires potentially conflicted employees, officers, or directors to recuse themselves from involvement in transactions with the related companies." The 2014 Consent Order concluded that "Erbey has not in fact recused himself from approvals of several transactions with the related parties." The NYDFS required that HLSS, Ocwen, and the other related parties not share any common officers or employees, among other significant operational and corporate governance changes. Also as part of the settlement detailed in the Consent Order, Ocwen agreed to payment of $150 million in penalties and restitution.

76. Pursuant to the 2014 Consent Order, Defendant Erbey resigned as Chairman of HLSS, Ocwen and the other related parties, effective January 16, 2015. The Company issued a press release regarding Erbey's forced resignation and announcing that Robert J. McGinnis would be the new chairman.

77. In response to these shocking admissions and revelations, HLSS stock fell by $1.02 per share, or about 5%, from $20.85 per share on December 19, 2014 to $19.83 per share on December 22, 2014.

78. Analysts attributed HLSS's and the Ocwen-related entities' fall to this news. A December 22, 2014 USA Today article noted that Ocwen's stock "closed down nearly 26.9% at $16.01. Shares of several firms related to Ocwen also dropped sharply."[20] For example, in a December 23, 2014 report, analysts at Sterne Agee wrote that "[t]he settlement between Ocwen

---

[20] http://www.usatoday.com/story/money/business/2014/12/22/ocwen-william-erbey-conflicts/20754655/

and the New York Department of Financial Services went way beyond anything we were anticipating . . . .”

79. On January 12, 2015, the *Los Angeles Times* reported that the CDBO, which licenses and oversees the operations of nonbank mortgage servicers in California, intended to suspend the mortgage license of Ocwen because Ocwen had repeatedly failed to produce documentation showing that it was in compliance with the California state homeowner protection laws, in particular California’s Homeowner Bill of Rights.[21] The article noted that losing its license would be a “big blow to Ocwen, which counts California as its biggest source of business. As of Sept. 30, the company serviced 378,132 home loans in California with unpaid principal of $95 billion. That amounts to 15% of Ocwen’s total loans and 23% of the total balance due.” On January 13, 2015, *The New York Times* published an article entitled “California Regulator Pushes to Suspend Ocwen Financial’s License in State.”[22] Multiple additional media outlets reported the possible suspension of Ocwen’s mortgage license. The issue was seen as another huge blow to the Ocwen business group, as California is Ocwen’s biggest source of business. This news was particularly relevant to HLSS since California had a large percentage of subprime and Alt-A loans, which usually result in larger servicing fees.

80. In reaction to this news, HLSS stock price plummeted $3.14 per share, or 19.5%, on extremely heavy trading volume from $16.09 per share on January 12, 2015 to $12.95 per share on January 13, 2015.

---

[21] Rickard, Scott E., LOS ANGELES TIMES, Business, “California seeking to suspend Ocwen Financial’s mortgage license,” January 12, 2015, *available at* http://www.latimes.com/business/la-fi-ocwen-mortgage-license-20150113-story.html.

[22] Corkery, Michael, NEW YORK TIMES, Dealbook, “California Regulator Pushes to Suspend Ocwen Financial’s License in State,” January 13, 2015, *available at* http://dealbook.nytimes.com/2015/01/13/california-regulator-pushes-to-suspend-ocwen-financials-license-in-state/.

81. On January 14, 2015, Moody's downgraded HLSS's Corporate Family Rating and Senior Secured Bank Credit Facility to B3 from B2.[23] In its press release announcing the downgrade, Moody's explained that "[t]he rating actions reflect the continued regulatory scrutiny of Ocwen that could lead to the loss of their license to service loans in California along with the seriously impaired franchise value of the three companies." Moody's added that the downgrade of HLSS's rating was "driven by [HLSS's] reliance on Ocwen. Virtually all of HLSS's assets were acquired from Ocwen and as of Q3 2014 approximately 60% of Altisource's revenues were derived from its relationship with Ocwen." Moreover, HLSS's rating "continue[d] to be strongly tied to Ocwen's ratings."

82. Standard & Poor's ("S&P") similarly downgraded its outlook on HLSS from stable to negative on January 16, 2015. That downgrade was also "based on the risk that the company's sole subservicer, Ocwen, could lose the right to servicing mortgages in California—[HLSS's] largest state exposure." According to S&P, "[t]he negative outlook also reflects Ocwen's broader regulatory challenges."

83. On January 23, 2015, the CDBO entered into a settlement with Ocwen to end the process of suspending Ocwen's mortgage license, the terms of which provided that the CDBO would cease its effort to suspend Ocwen's mortgage license in exchange for $2.5 million and administrative costs from Ocwen. Further, Ocwen is prohibited from taking on any new California customers until the CDBO determines the firm can fully respond in a timely manner to future requests for information. Moreover, the CDBO would select an independent, third-party auditor to ensure Ocwen's compliance in providing all sought-after information from loan

[23] https://www.moodys.com/research/Moodys-downgrades-Ocwens-Altisource-Solutions-and-HLSS-ratings-to-B3--PR_316455

files to the CDBO. The CDBO maintains the right to pursue enforcement against Ocwen if an audit of the California loan files reveals any material violations of the California laws.

84. Also on January 23, 2015, hedge fund BlueMountain Capital Management ("BlueMountain"), a holder of HLSS bonds, sent notices of default (the "First Notice of Default") to HLSS and Ocwen for certain notes, worth approximately $1 billion, that HLSS serviced. Due to Ocwen's violation of various laws and regulations, HLSS was in breach of specific provisions of the Sixth Amended and Restated Indenture. The First Notice of Default described the interconnectedness of HLSS and Ocwen, stating that "[e]videncing the significance of these affirmations of Ocwen's servicing misconduct, the rating agencies expressly referenced the state regulatory authorities' actions as a basis for their decisions to downgrade Ocwen's servicer rating and the corporate ratings of related entities, Ocwen Financial Corporation and Home Loan Servicing Solutions, Ltd. Likewise, the share price of the two related companies fell precipitously following the announcement of the California suspension proceeding, *i.e.*, by approximately 36% and 20%, respectively."

85. A January 23, 2015 *Bloomberg* article entitled "BlueMountain Says Ocwen Affiliate HLSS Defaulted on Debt," stated the following:

> BlueMountain Capital Management, the $20 billion investment firm, said "misconduct" by Ocwen Financial Corp. triggered a default in securities issued by an affiliate of the mortgage servicer.
>
> The types of bonds that BlueMountain said it owned, backed by payments related to delinquent home loans, totaled about $1.2 billion when they were sold in 2012 and 2013 by Home Loan Servicing Solutions LLC, according to data compiled by Bloomberg. The notes and similar securities were issued by a trust that last year held $5.3 billion of the receivables, according to a presentation in September by the Home Loan Servicing, which buys servicing rights from Ocwen and hires it to oversee the loans.
>
> * * *

> Ocwen settled with New York last month after the state criticized it for funneling foreclosure-related business to affiliated entities and citing examples where the company backdated letters to borrowers that made it more difficult for the homeowners to modify their mortgages. California has said it's seeking to suspend Ocwen after the company failed to provide information needed to assess its compliance with a state law.
>
> "These (and other) agencies' findings and enforcement actions demonstrate Ocwen's systemic, long-standing and continuing servicing failures and disregard of applicable and analogous laws," Erik Haas, a lawyer for BlueMountain at Patterson Belknap Webb & Tyler LLP, said in a letter to the trustee attached to the statement.
>
> The deals' terms require Ocwen to comply with applicable laws and operate in line with standards being used by "prudent" servicers, he said.

86. In response to the CDBO settlement and the First Notice of Default, the price of HLSS common shares fell by $1.59 per share, or over 10%, on unusually high volume, from a close of $15.35 on January 22, 2015 to a close on January 23, 2015 of $13.76 per share. The Company's stock price continued to decline substantially in the following trading days, declining an additional $0.69 the following trading day to close at $13.07 on January 26, 2015 on unusually high trading volume, and reaching a low of $12.06 on January 30, 2015. This was a far cry from the Company's Class Period high of $25.41 on August 1, 2013:




## VI. <u>POST-CLASS PERIOD DEVELOPMENTS AND ADMISSIONS</u>

87. Following the end of the Class Period, HLSS's subsequent disclosures in connection with the fraud exacerbated the Company's financial troubles, leading to, among other things, notices of default and further credit downgrades by ratings agencies, which resulted in the eventual asset sale of the Company.

88. Reacting to BlueMountain's notice of default, on January 26, 2015, Compass Point downgraded HLSS from Neutral to Sell with a price target of $10.00. The reason for the downgrade included "[h]eightened regulatory and bondholder risks at Ocwen" that "are translating into increased funding risk at HLSS." TheStreet Ratings also downgraded HLSS from Buy to Hold with a ratings score of C.

89. Company attempts to allay investor fears were unsuccessful, as the stock price continued to drop, from an open of $14.50 to a close of $13.07 on January 26, 2015. Zacks

Equity Research noted that "the move came on pretty good volume too with far more shares changing hands than in a normal session. This continues the recent downtrend for HLSS, as the stock is now down nearly 35% in the past one-month time frame."[24] The stock continued to fall over the next few days, closing at a low of $12.06 per share on January 30, 2015.

90. On February 9, 2015, the Mangrove Partners Master Fund, Ltd. ("Mangrove Partners") publicly announced delivery of a letter to HLSS's Board of Directors urging termination of HLSS's relationship with Ocwen, as well as announcing its intention to nominate a slate of directors to the HLSS Board.[25] The letter explained that "Ocwen acts as servicer for all of the RMSRs that HLSS owns. We believe that Ocwen earns significant profits from this relationship." Mangrove Partners stated that it "believe[d] that continuing to expose HLSS to Ocwen-related risks by leaving the Ocwen relationship intact constitutes a dereliction of [the Board's] duty to the Company and a grave risk to all shareholders."

91. Mangrove Partners asserted that "transferring servicing would give HLSS the opportunity to engage with servicers that have greater servicing stability, better management oversight, stronger relationships with regulators, and higher ratings." Moreover, "[i]n addition to shielding HLSS shareholders from Ocwen-related risks…a transfer of the servicing rights will create significant value for HLSS and its shareholders." Mangrove Partners stated that Ocwen should not own its own call rights, as "clean up call rights belong to the servicer of the private label mortgages, their value should accrue to HLSS as part of the price it receives in a transfer of the MSRs." In addition, Mangrove Partners expressed that Altisource too was profiting at

---

[24] http://www.zacks.com/stock/news/161763/home-loan-servicing-solutions-hlss-crumbles-stock-falls-by-5

[25] http://www.prnewswire.com/news-releases/mangrove-partners-delivers-letter-to-board-of-directors-of-home-loan-servicing-solutions-ltd-urging-termination-of-hlsss-relationship-with-ocwen-loan-servicing-llc-300032784.html

HLSS's expense as "[a] third party servicer to which HLSS transfers servicing could derive significant value from performing the services that ASPS is currently performing, and we believe that HLSS could be compensated for this in the sale price of the servicing rights." Mangrove Partners believed that the January 2014 Wells Fargo proposed transaction, whose "agreed-upon purchase price was $2.7 billion, including $280 million for the MSR, $115 million for deferred servicing fees, and $2.3 billion for outstanding servicing advances," served as a "point of reference for the value HLSS could receive in a sale to a third party." HLSS barely received half that amount in the Asset Sale. Mangrove Partners subsequently nominated five individuals for election to the HLSS Board on February 12, 2015.

92. On February 20, 2015, BlueMountain announced delivery of a second notice of default to the Company (the "Second Notice of Default"). BlueMountain wrote to supplement the First Notice of Default with additional events—downgrades of Ocwen's servicer rating by Moody's and Fitch—constituting "defaults and termination events in agreements governing Ocwen's mortgage servicing rights that collateralize the obligations of the (HLSS Servicer Advance Receivables Trust) to the Noteholders."

93. On February 20, 2015, Keefe, Bruyette & Woods downgraded the Company from Outperform to Market Perform.

94. On February 22, 2015, HLSS announced the proposed New Residential acquisition of the Company. HLSS announced that it had agreed to a definitive merger agreement under which New Residential would acquire all of the outstanding shares of HLSS for $18.25 per share in cash, totaling approximately $1.3 billion. In response to the acquisition deal, on February 23, 2015, Compass Point, Sterne Agee, Piper Jaffray and Deutsche Bank each downgraded HLSS.

95. On March 3, 2015, HLSS filed a Form 12b-25 indicating its need for additional time to file its 2014 Form 10-K, in order to "complete the assessment of recent events related to [HLSS's] business and determine the impact on [HLSS's] financial statements and related disclosures." On March 18, 2015, HLSS filed a Form 8-K indicating that the Company required additional time to prepare information related to its ability to operate as a going concern and to provide such information to its auditors for the purposes of their audit of HLSS's financial statements for the year ended December 31, 2014. On March 20, 2015, HLSS received a Notice of Noncompliance from the NASDAQ.

96. On March 23, 2015, the Company received a subpoena from the SEC requesting that it provide information concerning communications between the Company and certain investment advisors and hedge funds. The SEC also requested documents relating to the Company's structure, certain governance documents and any investigations or complaints connected to trading in the Company's securities.

97. On April 6, 2015, the Company and New Residential announced that they had abandoned the previously-announced merger agreement and instead had entered into a purchase agreement (the "Asset Sale") whereby New Residential would pay HLSS an equity purchase price of approximately $1.2 billion, or $17.08 per HLSS share for 71 million of its shares, as opposed to the merger price of $18.25 per share in cash, totaling approximately $1.3 billion. The reason for this unexpected change: HLSS was "unable to satisfy the merger conditions as originally expected." The Company admitted that the Asset Sale was entered into to "best address concerns relating to ***our ability to operate as a going concern and the associated impact on our business on an expedited basis***."

98. On April 10, 2015 the Board "declared a liquidating distribution in the aggregate amount of approximately $1.2 billion or $16.613 per share." The Company's stock was delisted on April 29, 2015.

## VII. DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

99. Defendants made false and misleading statements and material omissions during the Class Period in violation of Sections 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder. Among other things, Defendants falsely and misleadingly represented to investors that: (i) Ocwen had adequate servicing capabilities; (ii) no legal or contingent matters existed that would materially impact HLSS's business or financials; (iii) HLSS maintained adequate internal controls and risk management policies and procedures; (iv) that related-party transactions between HLSS, Ocwen and the Ocwen complex were conducted at arm's-length; and (v) that HLSS's accounting practices and procedures complied with GAAP. Each of these false statements and omissions impacted HLSS's stock price.

### A. False Statements Regarding Ocwen's Servicing Capabilities And Performance

100. In its February 28, 2012 Registration Statement, HLSS repeatedly and falsely stated that it "intend[ed] to capitalize on the servicing capabilities of Ocwen Loan Servicing, ***which we view as superior relative to other servicers*** in terms of cost, management experience, technology infrastructure and platform scalability."[26]

101. On May 21, 2012 HLSS released its 2012 Investor Presentation, wherein it falsely touted Ocwen's "***superior performance***" and "***strong proof of performance***" as a servicer.[27] HLSS further falsely boasted that the "***servicing relationship with Ocwen enhances value***."[28]

---

[26] February 28, 2012 Form S-1, at pp. 7, 29, 91, 116.

[27] May 2012 Investor Presentation, at p. 11.

102. In its Preliminary Prospectus/Registration Statement filed on August 17, 2012, HLSS falsely stated that it had "engaged Ocwen Loan Servicing, ***a high quality residential mortgage loan servicer***, to service the mortgage loans underlying our mortgage servicing assets and therefore have not and do not intend to develop our own mortgage servicing platform."[29] This false statement was repeated in substantially identical form in the September 5, 2012 Registration Statement,[30] the 2012 Investor Presentation, the 2012 10-K, and 2013 10-K.

103. On September 5, 2012, in an amended Registration Statement, HLSS again falsely stated that it had retained Ocwen, and described the company as a "***high quality residential mortgage loan servicer***."[31] HLSS made substantially similar false statements in its September 7, 2012 Prospectus[32] and its September 15, 2012 Amended Preliminary Prospectus/Registration Statement.[33]

104. In its 2012 Form 10-K, which was signed by all Individual Defendants, HLSS falsely referred to Ocwen as a "***high quality mortgage residential mortgage loan servicer***" and a "***leader***" among mortgage servicers.[34] HLSS also falsely stated that it would "continue to capitalize on the servicing capabilities of Ocwen which we view as ***superior relative to other servicers*** in terms of cost, management experience, market penetration, financial stability,

[28] May 2012 Investor Presentation, at p. 11.

[29] August 17, 2012 Form S-1, at pp.1, 95.

[30] September 5, 2012 Form S-1/A, at p. 95.

[31] September 5, 2012 Form S-1/A, at pp. 1, 95.

[32] September 7, 2012 Form 424B$, at pp. 1-2, 95-96.

[33] September 15, 2012 Form S-1/A, at pp. 2, 96.

[34] 2012 Form 10-K (filed on February 7, 2013), at p. 3.

technology infrastructure and platform scalability."[35] These false and misleading statements were repeated in substantially identical form in HLSS's 2013 Form 10-K.[36]

105. On September 22, 2014, HLSS presented at the ABS East 2014 Conference in Miami Beach, Florida. During its presentation, HLSS falsely referred to Ocwen as a "***[l]eading full-service provider of mortgage servicing***," and a "***[b]est in class servicer***."[37]

106. The previously emphasized statements were materially false and misleading because:

> (a) Under no reasonable meaning of the phrase could Ocwen be characterized as a high quality servicer or industry leader. In fact Ocwen was riddled with widespread and ongoing problems. Ocwen was disciplined at least 5 times by both Federal and State authorities, including the CFPB and the NYDFS. Indeed, as the CFPB explained, "Ocwen violated federal consumer financial laws at every stage of the mortgage servicing process," which "made troubled borrowers even more vulnerable to foreclosure." As the Chairman and a significant stakeholder in both HLSS and Ocwen, Erbey was well-aware of this fact.

> (b) Ocwen admitted in the 2014 Consent Order that "Ocwen regularly gives borrowers incorrect or outdated information, sends borrowers backdated letters, unreliably tracks data for investors, and maintains inaccurate records. There are insufficient controls in place—either manual or automated—to catch all of these errors and resolve them." The Consent Order found, on average, three violations per foreclosed loan. The Monitor disclosed that Ocwen's backdating problem had been occurring for years, and that Ocwen ignored the problem even after an employee alerted Ocwen's VP of Compliance.

> (c) The Monitor himself witnessed "serious deficiencies in Ocwen's internal review group process." In his May 30, 2014 update, the Monitor reported that Ocwen remained noncompliant with at least four servicing metrics. requiring Ocwen to notify borrowers of missing or incomplete documents.

> (d) Ocwen's problems were not limited to a single region. The CDBO forced Ocwen to pay $2.5 million and retain an independent auditor, and additionally found that Ocwen failed to comply with requests for information, failed to comply with a subpoena, "violated a lawful order from the commissioner," and "failed to comply with an order from an administrative law judge."

---

[35] 2012 Form 10-K (filed on February 7, 2013), at pp. 3, 8.

[36] 2013 Form 10-K (filed on February 6, 2014), at pp. 3, 7.

[37] ABS East 2014 Investor Presentation, *HLSS Service Advance Receivables Trust*, at 13.

(e) Further, Ocwen did not maintain sound corporate governance policies. No written policies existed to explicitly require potentially conflicted employees, officers, or directors to recuse themselves from potential conflicts. It is hardly surprising then that NYDFS revealed that Ocwen was engaged in conflicted related party transactions with HLSS, Altisource, and Altisource subsidiary Hubzu. These conflicted transactions were made even easier because Erbey was the dictatorial chairman of all companies in the Ocwen complex. Further, other employees such as S.P. Ravi, were also conflicted. Ravi, for example, was simultaneously the Chief Risk Officer of both Ocwen and Altisource, and reported to Erbey in both roles.

(f) Ocwen's problems were so fundamental that Erbey was forced to resign from his positions of Chairman, which, even during the financial crisis, was almost unprecedented.

## B. False Statements Regarding Legal Proceedings And Other Contingent Matters

107. On May 4, 2012, HLSS filed its 1Q 2012 Form 10-Q, which was signed by Defendant Lauter, and filed with certifications by Defendants Lauter and Van Vlack pursuant to Sections 302 and 906 of the Sarbanes Oxley Act of 2002 ("SOX"). The Q1 2012 10-Q falsely stated:

> **NOTE 16. COMMITMENTS AND CONTINGENCIES**
>
> We may be party to various claims, legal actions, and complaints arising in the ordinary course of business. ***There are currently no probable matters outstanding that, in the opinion of management, will have a material effect on our Consolidated Balance Sheets, Statements of Operations and Statements of Cash Flows***. There are also currently no reasonably possible matters outstanding that, in the opinion of management, will have a material effect on our Interim Condensed Consolidated Financial Statements.
>
> * * *
>
> **ITEM 1. LEGAL PROCEEDINGS**
>
> We may be party to various claims, legal actions, and complaints arising in the ordinary course of business. There are currently no probable matters outstanding that, in the opinion of management, will have a material effect on our Interim Condensed Consolidated Financial Statements. ***There are also currently no reasonably possible matters outstanding that, in the opinion of management, will have a material effect on our Interim Condensed Consolidated Financial Statements***.[38]

---

[38] 1Q 2012 Form 10-Q (filed on May 4, 2012), at pp. 21, 34.

108. HLSS made substantially similar false statements in its regulatory filings throughout the Class Period, including in its Forms 10-Q for the periods 2Q 2012,[39] 3Q 2012,[40] 1Q 2013,[41] 2Q 2013,[42] 3Q 2013,[43] 1Q 2014,[44] 2Q 2014,[45] and 3Q 2014,[46] and in its Forms 10-K for the periods 2012[47] and 2013,[48] both of which were signed by all of the Individual Defendants.

109. The previously emphasized statements were materially false and misleading because:

> (a) The parade of Federal and State investigations into Ocwen revealed one serious illegal action after another. Because Ocwen and HLSS were virtually indistinguishable from each other, legal proceedings and investigations into Ocwen would necessarily impact HLSS. Indeed, the NYDFS eventually required Erbey to resign

---

[39] 2Q 2012 Form 10-Q (filed on July 16, 2012), at pp. 22, 35.

[40] 3Q 2012 Form 10-Q (filed on October 18, 2012), at pp. 25, 38.

[41] 1Q 2013 Form 10-Q (filed on April 18, 2013), at pp. 19, 29.

[42] 2Q 2013 Form 10-Q (filed on July 18, 2013), at pp. 20, 33.

[43] 3Q 2013 Form 10-Q (filed on October 17, 2013), at p. 21, 33. In this filing, Item 1, "Legal Proceedings," specifically referred investors to the discussion on Commitments and Contingencies "for more information regarding legal proceedings."

[44] 1Q 2014 Form 10-Q (filed on April 17, 2014), at pp. 22, 36. In this filing, Item 1, "Legal Proceedings," specifically referred investors to the discussion on Commitments and Contingencies "for more information regarding legal proceedings."

[45] 2Q 2014 Form 10-Q (filed on August 18, 2014), at pp. 28, 48. In this filing, Item 1, "Legal Proceedings," specifically referred investors to the discussion on Commitments and Contingencies "for more information regarding legal proceedings."

[46] 3Q 2014 Form 10-Q (filed on October 16, 2014), at pp. 28, 47. In this filing, HLSS additionally stated that it received an SEC subpoena relating to its financial restatement, under the "Commitments and Contingencies" heading, but issued no further disclosures. Further, Item 1, "Legal Proceedings," specifically referred investors to the discussion on Commitments and Contingencies "for more information regarding legal proceedings."

[47] 2012 Form 10-K (filed on February 7, 2013), at p. F-28. This filing did not include the "Legal Proceedings" statement present in the quarterly filings.

[48] 2013 Form 10-K (filed on February 6, 2014), at p. F-31. This filing did not include the "Legal Proceedings" statement present in the quarterly filings.

from his Chairman positions at HLSS, Ocwen, and the other companies in the Ocwen complex.

(b) The NYDFS Compliance Monitor's review of Ocwen revealed 1,358 violations of Ocwen's legal obligations, including "failing to confirm that it had the right to foreclose before initiating foreclosure proceedings," "failing to ensure that its statements to the court in foreclosure proceedings were correct," and "pursuing foreclosure even while modification applications were pending."

(c) The NYDFS revealed, and Ocwen admitted, that "Ocwen's reliance on technology has led it to employ fewer trained personnel than its competitors," and according to Ocwen's Chief Financial Officer, "Ocwen [was] simply 'training people to read the scripts and the dialogue engines with feeling.'" throughout all relevant times.

(d) The NYDFS revealed, and Ocwen admitted, that "Ocwen's inadequate infrastructure and ineffective personnel have resulted in Ocwen's failure to fulfill its legal obligations," and "[p]rior to the [DFS] review, Ocwen did not take adequate steps to implement the reforms that it was legally obligated to implement pursuant to the 2011 Agreement."

(e) The NYDFS revealed that Ocwen had known it was backdating letters since at least November 2013.

(f) The NYDFS and CDBO both had outstanding investigations of Ocwen, which would in fact threaten to materially impact its business, specifically with respect to the CDBO proceedings because California is Ocwen's largest market.

### C. False Statements Regarding HLSS's Risk Management and Internal Controls

110. HLSS repeatedly assured investors that it had reliable risk management procedures and stable internal controls that would enable it to identify and adequately disclose risks. Yet these controls were provided by Ocwen and Altisource, both of whose inadequate control systems are themselves the causes of several private and government actions. Defendants knew and/or recklessly disregarded that the provisioning of services through Ocwen and Altisource rendered HLSS's controls inferior.

111. On May 4, 2012, HLSS filed its 1Q 2012 Form 10-Q, which included two certifications, signed by Van Vlack and Lauter pursuant to Sections 302 of the Sarbanes Oxley Act of 2002 ("SOX"), which falsely stated:

I, [John P. Van Vlack/James E. Lauter], certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of Home Loan Servicing Solutions, Ltd.;

2. Based on my knowledge, ***this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading*** with respect to the period covered by this report;

3. Based on my knowledge, ***the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant*** as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a – 15(e) and 15d – 15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a – 15(f) and 15d – 15(f)) for the registrant and have:

> (a) ***Designed such disclosure controls and procedures***, or caused such disclosure controls and procedures to be designed under our supervision, ***to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others*** within those entities, particularly during the period in which this report is being prepared;
>
> (b) [paragraph deleted in accordance with SEC release no. 34-47986]
>
> (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> (d) Disclosed in this report any changes in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting . . . .[49]

---

[49] 1Q 2012 Form 10-Q (filed on May 4, 2012), at Ex. 31.1 and Ex. 31.2.

112. Van Vlack and Lauter made substantially similar false statements in HLSS's regulatory filings throughout the Class Period, including in Forms 10-Q for the periods 2Q 2012,[50] 3Q 2012,[51] 1Q 2013,[52] 2Q 2013,[53] 3Q 2013,[54] and 1Q 2014.[55]

113. On May 21, 2012, HLSS released its 2012 Investor Presentation, in which it falsely boasted that "***Ocwen assumes all operating risk***, and that the HLSS-Ocwen relationship was a stable one that afforded "***[s]olid downside protection***."[56] These statements were falsely repeated in substantially identical form in the June 5, 2013 Investor Presentation.[57]

114. In its 2012 Form 10-K and 2013 Form 10-K, HLSS included the following false statement:

> Our management, under the supervision of and with the participation of our President and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act) as of [the last day of the reporting period]. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control—Integrated Framework. Based on this evaluation, ***our President and Chief Financial Officer concluded that*** as of [the last day of the reporting period] ***our disclosure controls and procedures (1) were designed and functioning effectively to ensure that material information relating to HLSS, including its consolidated subsidiaries, is made known to our President and Chief Financial Officer*** by others within those entities particularly during the period in which this report was being prepared ***and (2) were operating effectively*** in that they provided reasonable assurance that information required to be disclosed by HLSS in the reports that it files or submits under the Securities Exchange Act of 1934 (i) is recorded, processed, summarized and reported within

[50] 2Q 2012 Form 10-Q (filed on July 16, 2012), at Ex. 31.1 and Ex. 31.2.

[51] 3Q 2012 Form 10-Q (filed on October 18, 2012), at Ex. 31.1 and Ex. 31.2.

[52] 1Q 2013 Form 10-Q (filed on April 18, 2013), at Ex. 31.1 and Ex. 31.2.

[53] 2Q 2013 Form 10-Q (filed on July 18, 2013), at Ex. 31.1 and Ex. 31.2.

[54] 3Q 2013 Form 10-Q (filed on October 17, 2013), at Ex. 31.1 and Ex. 31.2.

[55] 1Q 2014 Form 10-Q (filed on April 17, 2014), at Ex. 31.1 and Ex. 31.2.

[56] May 21, 2012 Investor Presentation, at p. 5.

[57] June 5, 2013 Investor Presentation, at p. 16,

the time periods specified in the SEC's rules and forms and (ii) accumulated and communicated to management, including the President or Chief Financial Officer, as appropriate, to allow timely decisions regarding disclosure.[58]

115. HLSS made substantially similar false statements in its regulatory filings throughout the Class Period, including in its Forms 10-Q for the periods 2Q 2012,[59] 3Q 2012,[60] 1Q 2013,[61] 2Q 2013,[62] 3Q 2013,[63] and 1Q 2014,[64] all of which contained identical SOX certifications signed by Defendants Lauter and Van Vlack, and in its Forms 10-K for the periods 2012[65] and 2013,[66] both of which were signed by all of the Individual Defendants.

116. The 2012 Form 10-K also included two certifications signed pursuant to SOX Section 302, in which Van Vlack and Lauter falsely stated:

I, [John P. Van Vlack/James E. Lauter], certify that:

1. I have reviewed this Annual Report on Form 10-K of Home Loan Servicing Solutions, Ltd.;

2. Based on my knowledge, ***this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading*** with respect to the period covered by this report;

3. Based on my knowledge, ***the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant*** as of, and for, the periods presented in this report;

---

[58] 1Q 2012 Form 10-Q (filed on May 4, 2012), at p. 33.

[59] 2Q 2012 Form 10-Q (filed on July 16, 2012), at pp. 34-35.

[60] 3Q 2012 Form 10-Q (filed on October 18, 2012), at pp. 38.

[61] 1Q 2013 Form 10-Q (filed on April 18, 2013), at pp. 29.

[62] 2Q 2013 Form 10-Q (filed on July 18, 2013), at pp. 33.

[63] 3Q 2013 Form 10-Q (filed on October 17, 2013), at p. 33.

[64] 1Q 2014 Form 10-Q (filed on April 17, 2014), at pp. 34-35.

[65] 2012 Form 10-K (filed on February 7, 2013), at p. 43.

[66] 2013 Form 10-K (filed on February 6, 2014), at p. 40.

> 4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> > a) ***Designed such disclosure controls and procedures***, or caused such disclosure controls and procedures to be designed under our supervision, ***to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us*** by others within those entities, particularly during the period in which this report is being prepared;
> >
> > b) [paragraph deleted in accordance with SEC release no. 34-47986]
> >
> > c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
> >
> > d) Disclosed in this report any changes in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting . . . .[67]

117. Van Vlack and Lauter falsely made substantially identical statements in the 2013 Form 10-K.[68]

118. On April 17, 2014, HLSS published its 2014 Proxy Statement. In it, HLSS falsely stated:

> **Risk Management and Oversight Process**
>
> Our Board of Directors and each of its Committees are involved in overseeing risk associated with the Company. ***The Board of Directors and the Audit Committee monitor HLSS' credit risk, liquidity risk, regulatory risk, operational risk and enterprise risk by regular reviews with management and internal and external auditors. In its periodic meetings with the internal auditors and the***

---

[67] 2012 Form 10-K (filed on February 7, 2013), at Ex. 31.1 and Ex. 31.2.

[68] 2013 Form 10-K (filed on February 6, 2014), at Ex. 31.1 and Ex. 31.2.

> ***independent accountants, the Audit Committee discusses the scope and plan for the internal audit and includes management in its review of accounting and financial controls, assessment of business risks and legal and ethical compliance programs***. The Board of Directors and the Nominating and Corporate Governance Committee monitor the Company's governance and succession risk by regular review with management. The Board of Directors and the Compensation Committee monitor the Company's compensation policies and related risks by regular reviews with management. ***The Board of Directors' role in risk oversight is consistent with the Company's leadership structure with the Chief Executive Officer and other members of senior management having responsibility for assessing and managing the Company's risk exposure, and the Chairman, the Board of Directors and its Committees providing oversight in connection with these efforts***.

119. The previously emphasized statements were materially false and misleading because neither HLSS nor Ocwen possessed an effective framework to ensure that material information was correctly identified and fully disclosed to investors:

> (a) On August 18, 2014, HLSS was forced to restate its financials for 2012 and 2013. A financial "restatement" is a term of art in accounting under Generally Accepted Accounting Principles ("GAAP"). By issuing a "restatement" of prior financials, as opposed to an "out-of-period adjustment," a company admits that: (i) the original statement of the company's finances was materially false and misleading; and (ii) the financial statement was incorrect based on information available to the company at the time the results were originally reported. *See* ASC 250-10-S99; ASC 105-10-05-6. Under GAAP, errors resulting in a restatement of previously issued financial statements are, by definition, "material." *Id.*
>
> (b) HLSS's internal controls were identical to and provided by Ocwen, who in the 2014 Consent Order admitted to having highly ineffective controls over the management and disclosure of material information.
>
> (c) The REALServicing loan servicing software was fatally deficient, as Ocwen admitted in the 2014 Consent Order. These fatally deficient flaws directly resulted in faulty data input concerning valuation of its notes receivable, primarily because "Ocwen was not capable of tracking servicing fee arrangements at the individual loan level."

### D. False Statements Regarding Related Party Transactions

120. On December 3-4, 2013, HLSS, Ocwen, Altisource, Residential and AAMC held a Joint Investor and Analyst Day conference. During a slideshow presentation on December 4, 2013, HLSS reassured investors of the propriety of its relationship with "strategic allies,"

including Ocwen. HLSS falsely boasted that its "strategic allies" have "***separate Boards and separate management***," that "***Robust Related Party Transaction Approval Policies***" exist, and that it fosters "***[t]ransparency in inter company [sic] relationships through public company disclosures***."[69]

121. Both Erbey and Van Vlack were present during this presentation. In his speech, Erbey falsely stated:

> ***I'd like to stress, first of all, that these companies are not affiliates, that they are independent companies.*** They have independent boards, and they have management teams.
>
> * * *
>
> ***One of the things I'd like to stress again is that the strategic allies are not affiliates,*** that each company has its own separate Board of Directors, a majority of whom are independent, ***and we have robust related party transaction approval process. Any related party transaction between the companies, I actually recuse myself from that position*** and we make all of our -- reportedly, we make contracts in all of the companies publicly available to you on our website.

122. On April 17, 2014, HLSS filed is Proxy Statement. Under the heading "Relationship with Executive Chairman of the Board of Directors," HLSS falsely stated:

> Mr. Erbey currently serves as Executive Chairman of Ocwen and as non-executive Chairman of HLSS, Altisource, Residential and AAMC. As a result, he has obligations to HLSS as well as to Ocwen, Altisource, Residential and AAMC. As of December 31, 2013, Mr. Erbey owned or controlled approximately 13% of Ocwen's common stock, 26% of Altisource's common stock, 5% of Residential's common stock and 27% of AAMC's common stock. As of December 31, 2013, Mr. Erbey also held 4,620,498 options to purchase Ocwen common stock, of which 2,845,498 were exercisable, and he held 873,501 options to purchase Altisource common stock, 291,164 options to purchase Residential common stock and 87,350 options to purchase AAMC common stock, all of which were exercisable. ***Due to the nature of Mr. Erbey's obligations to each of the companies, he recuses himself from decisions pertaining to any transactions between them***.[70]

---

[69] December 4, 2013 Investor Presentation, at 7.

[70] April 17, 2014 Form 14A, at p.33.

123. The previously emphasized statements were materially false and misleading because:

(a) In February 2014, the NYDFS "uncovered a number of potential conflicts of interest" between Ocwen and HLSS, which raised "serious doubts on recent public statements" regarding the true nature of Ocwen's relationship with the Company.

(b) As admitted in the 2014 Consent Order, "Ocwen does not have a written policy that explicitly requires potentially conflicted employees, officers, or directors to recuse themselves from involvement in transactions with the related companies."

(c) As stated and admitted to in the 2014 Consent Order, "Mr. Erbey has not in fact recused himself from approvals of several transactions with related parties," and instead "has participated in the approval of a number of transactions between [Ocwen and Altisource] or from which Altisource received some benefit, including the renewal of Ocwen's force[] placed insurance program in early 2014." The NYDFS also revealed that on January 15 and 16, 2014, Erbey approved an Ocwen transaction as a member of the Credit Committee, despite not meeting to discuss the proposal, taking no minutes of the consideration and not presenting it to Ocwen's Board for review. The NYDFS concluded that while at Ocwen, "Mr. Erbey has approved a number of transactions with the related companies, despite Ocwen's and Altisource's public claims – including in SEC filings – that he recuses himself from decisions involving related companies."

(d) HLSS's senior executives came directly from Ocwen. Van Vlack was formerly CFO and Chief Accounting Officer, while Lauter was the former Vice President of Finance. Further, Erbey and the other directors of HLSS held large amounts of shares in the related companies, which further incentivized Defendants to contain all transactions within the Ocwen complex. Erbey was the beneficial owner of approximately 13% of Ocwen's common stock as of June 30, 2012. Richard Delgado, Treasurer of HLSS, owned 12,291 shares of Ocwen common stock. In addition, in connection with their resignation from their positions at Ocwen at the time of the closing of its initial public offering, the Ocwen Board of Directors extended the post-termination exercise period of options to purchase 625,000 shares of Ocwen common stock held by Defendant Van Vlack, 90,197 shares of Ocwen common stock held by Delgado and 20,000 shares of Ocwen common stock held by HLSS General Counsel Michael J. McElroy. The options would otherwise have expired following the date of such officers' resignation from Ocwen. The NYDFS letter dated February 26, 2014, demanded further information on this specifically, stating that "Presently, Ocwen's management owns stock or stock options in the affiliated companies. This raises the possibility that management has the opportunity and incentive to make decisions."

## VIII. HLSS'S VIOLATIONS OF GAAP AND SEC REGULATIONS

### A. Overview and Background of GAAP

124. During the Class Period, Defendants represented that HLSS's financial statements were prepared in conformity with GAAP. GAAP are recognized by the accounting profession and the SEC as the uniform rules, conventions and procedures necessary to define accepted accounting practice at a particular time. HLSS's materially false and misleading financial statements resulted from a series of deliberate senior management decisions designed to conceal the truth regarding HLSS's actual financial position and operating results. Defendants caused the Company to violate GAAP and SEC rules by, among other things, improperly overstating the Company's Notes receivable—Rights to MSRs and related interest income.

125. As set forth in Financial Accounting Standards Board ("FASB") Statements of Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting is to provide accurate and reliable information concerning an entity's financial performance during the period being presented. Concepts Statement No. 1, paragraph 42, states:

> Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

126. Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.

127. SEC Rule 4-01(a) of SEC Regulation S-X provides that: "Financial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1). Management is responsible for preparing

financial statements that conform to GAAP. As stated in the professional standards adopted by the AICPA:

> [F]inancial statements are management's responsibility . . . . [M]anagement is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities and equity are within the direct knowledge and control of management . . . . Thus, the fair presentation of financial statements in conformity with Generally Accepted Accounting Principles is an implicit and integral part of management's responsibility.

128. The defendants caused the Company to violate GAAP and SEC rules by, among other things:

(b) Improperly overstating the Company's Interest Income;

(c) Improperly overstating the Company's Notes receivable—Rights to MSRs; and

(d) Improperly failing to maintain an adequate system of internal controls.

**B. HLSS's Business Model**

129. The Company's business model was based on purchasing mortgage servicing rights, rights to fees and other income from servicing mortgage loans and associated servicing advances and engaging one or more high-quality residential mortgage loan servicers to service the pools of mortgage loans underlying its mortgage servicing rights. Acquiring Rights to MSRs resulted in the Company recording Notes Receivable—Rights to MSRs, Match funded advances and Match funded liabilities which entitled HLSS to collect the contractual servicing fees related to such Rights to MSRs which are typically 50 basis points annually of the unpaid principal balance of the related mortgage loans. Servicing fees collected were reduced by the portion of fees paid to Ocwen, and the retained fees were further reduced by the amortization of the Notes

Receivable—Rights to MSRs to arrive at revenue or interest income from the Notes Receivable—Rights to MSRs.

**C. Defendants' Improper Accounting of Notes Receivable – Rights to MSRs**

130. HLSS's reported financial position during the Class Period was materially false and misleading because the Company overstated its Notes receivable – Rights to MSRs due to its failure to adjust the carrying value of the Notes receivable—Rights to MSRs to fair value, for changes in the present value of the net cash flows related to the then outstanding UPB of the underlying mortgage servicing rights. Further, as a result of the improper accounting of the Notes receivable—Rights to MSRs, the Company also overstated its revenue – interest income, during the years ended 2012 and 2013.

131. FASB Accounting Standards Codification ("ASC") 860, *Transfers and Servicing*, requires that companies measure MSR "at fair value at each reporting date and report changes in fair value of servicing assets and servicing liabilities in earnings in the period in which the changes occur."

132. Defendants represented that the Company's policies complied with GAAP in accounting for the Company's Notes Receivable—Rights to MSRs. For example, in the Company's 2012 Form 10-K, Defendants disclosed in pertinent part, the following:

> Notes Receivable—Rights to MSRs and Interest Income
>
> Accounting Standards Codification ("ASC") 860, *Transfers and Servicing*, specifically prohibits accounting for a transfer of servicing rights as a sale if legal title to such servicing rights has not passed to the purchaser. As a result, prior to receiving the Required Third Party Consents related to the mortgage servicing rights, we are required to account for the purchase of the Rights to MSRs as a financing. We initially recorded the Notes receivable—Rights to MSRs at the purchase price of the Rights to MSRs. We amortize the Notes receivable—Rights to MSRs using the prospective interest method of accounting. ***At each reporting date, we calculate the present value of the net cash flows related to the then outstanding UPB of the underlying mortgage servicing rights and adjust the carrying***

> ***value of the Notes receivable—Rights to MSRs to this amount.*** The change in the carrying value of the Notes receivable—Rights to MSRs reduces the net servicing fees received by us with respect to the mortgage servicing rights and the servicing fees paid to Ocwen with respect to the mortgage servicing rights. We record the resulting amount as Interest income. Interest income is our primary source of income prior to receiving the Required Third Party Consents.[71]

133. The foregoing statements were materially false and misleading because Defendants did not fully adjust the carrying value of notes receivable as the Company was not accounting for changes in the mortgage-servicing rights if the value changed by less than 5% in a quarter. The Company's failure to properly account for and intentional and/or reckless failure to disclose this improper accounting regarding HLSS's Notes Receivable—Rights to MSRs was materially misleading to investors. Accordingly, in order to falsely and materially inflate net income, assets and stockholders' equity during the Class Period, defendants violated GAAP and SEC rules by overstating HLSS's Notes Receivable—Rights to MSRs in its financial statements.

**D. Defendants Failed to Disclose the Company's Accounting Policies**

134. Defendants also violated GAAP, by providing incomplete and materially misleading disclosures in its public filings during the Class Period.

135. ASC 235, *Notes to Financial Statements*, states the following regarding accounting policy disclosures:

> Disclosure of accounting policies shall identify and describe the accounting principles followed by the entity and the methods of applying those principles that materially affect the determination of financial position, cash flows, or results of operations. In general, the disclosure shall encompass important judgments as to appropriateness of principles relating to recognition of revenue and allocation of asset costs to current and future periods; in particular, it shall encompass those accounting principles and methods that involve any of the following:

---

[71] HLSS 2012 Form 10-K at F-11 (Feb. 7, 2013); *see also* HLSS 2013 Form 10-K at F-10 (Feb. 6, 2014)(emphasis added unless otherwise noted).

a. A selection from existing acceptable alternatives

b. Principles and methods peculiar to the industry in which the entity operates, even if such principles and methods are predominantly followed in that industry

c. Unusual or innovative applications of U.S. GAAP.

136. In its footnotes to the consolidated financial statements, the Company described that "[a]t each reporting date, we calculate the present value of the net cash flows related to the then outstanding UPB of the underlying mortgage servicing rights and adjust the carrying value of the Notes receivable—Rights to MSRs to this amount." These statements were false and materially misleading because they failed to disclose that the Company was using an improper "accounting convention [which] provided for an allowable range of variation to the estimated fair value of the Notes receivable – Rights to MSRs of plus or minus 5%. . . ."[72]

**E. Defendants' Accounting Improprieties Were Material to HLSS's Financial Statements as Evidenced by the Restatement Itself**

137. In a slide during its September 2014 Investor Presentation, HLSS stated that "**MSR fair value changes do not affect cash or dividend**."

138. The foregoing statement was materially false and misleading because the improper accounting for Notes Receivable—Rights to MSRs had a material impact on HLSS's financial statements, including that as a result of HLSS's restatement requiring adjustments to MSR fair values, its cash position would be impacted as a result. According to GAAP, a retroactive restatement of financial statements is reserved for material accounting errors "resulting from mathematical mistakes, mistakes in the application of GAAP, or oversight or misuse of facts that existed at the time the financial statements were prepared." ASC 250 *Accounting Changes and Error Corrections*. Since GAAP allows only for correction of errors

[72] HLSS Form 10-K/A at 40 (Aug. 18, 2014).

that are "material," resulting from "mistakes in the application of GAAP . . . that existed at the time," by restating the Company's financial statements, Defendants have admitted the materiality of the errors in its previously-issued financial statements

139. In this regard, the Company disclosed in its 2013 Form 10-K/A that it had "determined that, for each period, the difference between the fair value and the carrying value of the Notes receivable – Rights to MSRs, and the resulting impact on the amortization of Notes receivable – Rights to MSRs, was material and, thus, the recorded amounts were not in accordance with [GAAP]."[73]

140. In the same filing, the Company informed investors that:

> At the time the Company issued the financial statements for the relevant periods, our accounting convention provided for an allowable range of variation to the estimated fair value of the Notes receivable – Rights to MSRs of plus or minus 5% based on the belief that this was an acceptable accounting convention. Variances within that range did not result in an adjustment to the carrying value of the assets to the single point estimate of fair value and were not considered in the application of the interest method when accounting for the Notes receivable – Rights to MSRs. The variance observed for the applicable periods fell within that range and, as a result, the Company did not adjust the recorded amount of the Notes receivable – Rights to MSRs. The Company has subsequently determined that it was required under GAAP to adjust the Notes receivable – Rights to MSRs to the best estimate of fair value and to include the effect of such fair value adjustments in the application of the interest method of accounting. The Company's valuation process now requires us to record the Notes receivable – Rights to MSRs at the single point estimate of fair value.[74]

141. The adjustments materially impacted the Company's previously reported financial results. As reflected in the charts below, the restatements materially reduced the Company's net income and cash provided by operating activities by $7.3 million for the year ended December

[73] HLSS Form 10-K/A, Explanatory Note (Aug. 18, 2014).

[74] *Id.*

31, 2012 and $10.0 million for the year ended December 31, 2013, while increasing net income by $20.7 million for the first quarter of 2014.[75]

| | Quarter Ended | | |
|---|---|---|---|
| | March 31, 2014 | | |
| (In thousands) | As Previously Reported | Adjustments | As Restated |
| | | | |
| Interest income notes receivable Rights to MSRs | $ 81,852 | $ 20,686 | $ 102,538 |
| Interest income other | 2,961 | | 2,961 |
| Total interest income | 84,813 | 20,686 | 105,499 |
| Related party revenue | 628 | | 628 |
| Total revenue | 85,441 | 20,686 | 106,127 |
| Operating expenses | 4,256 | | 4,256 |
| Income from operations | 81,185 | 20,686 | 101,871 |
| Other expense | | | |
| Interest expense | 37,511 | | 37,511 |
| Total other expense | 37,511 | | 37,511 |
| Income before income taxes | 43,674 | 20,686 | 64,360 |
| Income tax expense | - | | - |
| Net income | $ 43,674 | $ 20,686 | $ 64,360 |
| Earnings per share | | | |
| Basic | $ 0.61 | $ 0.30 | $ 0.91 |
| Diluted | $ 0.61 | $ 0.30 | $ 0.91 |

75 *See* HLSS Form 10-K/A Explanatory Note (Aug. 18, 2014).

| | Years ended | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | December 31, 2013 | | | | | | December 31, 2012 | | | | | | |
| (In thousands) | As Previously Reported | | Adjustments | | As Restated | | As Previously Reported | | Adjustments | | As Restated | | |
| Interest income notes receivable Rights to MSRs | $ | 245,863 | -$ | 10,037 | $ | 235,826 | $ | 54,699 | -$ | 7,254 | $ | 47,445 | |
| Interest income other | | 2,195 | | | | 2,195 | | 109 | | | | 109 | |
| Total interest income | | 248,058 | - | 10,037 | | 238,021 | | 54,808 | - | 7,254 | | 47,554 | |
| Related party revenue | | 1,811 | | | | 1,811 | | 2,316 | | | | 2,316 | |
| Total revenue | | 249,869 | - | 10,037 | | 239,832 | | 57,124 | - | 7,254 | | 49,870 | |
| Operating expenses | | 11,870 | | | | 11,870 | | 6,150 | | | | 6,150 | |
| Income from operations | | 237,999 | - | 10,037 | | 227,962 | | 50,974 | - | 7,254 | | 43,720 | |
| Other expense | | | | | | | | | | | | | |
| Interest expense | | 110,071 | | | | 110,071 | | 24,057 | | | | 24,057 | |
| Total other expense | | 110,071 | | | | 110,071 | | 24,057 | | | | 24,057 | |
| Income before income taxes | | 127,928 | - | 10,037 | | 117,891 | | 26,917 | - | 7,254 | | 19,663 | |
| Income tax expense | | 234 | | | | 234 | | 46 | | | | 46 | |
| Net income | $ | 127,694 | -$ | 10,037 | $ | 117,657 | $ | 26,871 | -$ | 7,254 | $ | 19,617 | |
| Earnings per share | | | | | | | | | | | | | |
| Basic | $ | 1.99 | -$ | 0.16 | $ | 1.83 | $ | 1.56 | -$ | 0.42 | $ | 1.14 | |
| Diluted | $ | 1.99 | -$ | 0.16 | $ | 1.83 | $ | 1.56 | -$ | 0.42 | $ | 1.14 | |

142. The restatements also materially impacted HLSS's Notes receivable – Rights to MSRs, which decreased by $17.3 million and $7.3 million as of December 31, 2013 and 2012, respectively, and increased by $3.3 million as of March 31, 2014.

## IX. ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

143. Numerous facts, in addition to those discussed above, raise a strong inference that Defendants knew or were severely reckless in disregarding the true facts concerning Ocwen's violations and the effect they would have on HLSS when disseminating the false and misleading statements discussed herein. Because the management of HLSS came directly from Ocwen, and Erbey was simultaneously the Chairman of HLSS and Ocwen, Defendants were fully aware of the misconduct occurring at Ocwen.

144. In addition to the facts set forth above, Defendants' scienter is demonstrated by the following summary.

145. *Defendants made repeated statements about Ocwen's capabilities and value as a "high quality servicer," assuring investors that Ocwen was able to fulfill the various regulatory*

*and contractual servicing requirements.* On several occasion throughout the Class Period, Defendants discussed HLSS's business and the fact that it had no internal servicing capabilities, stating that HLSS "d[id] not intend to develop its own mortgage servicing platform but instead will rely on high quality third-party mortgage loan servicers." Defendants also stressed the efficiency, low costs, and "scalability" of the platform provided to it by Ocwen, as well as the services provided by Altisource. Defendants were well aware that Ocwen was fundamentally inadequate as a servicer.

146. *Erbey knowingly presided over Ocwen's admitted misconduct*. Defendant Erbey controlled all aspects of the Ocwen complex, including formation of related companies and control procedures concerning conflicted transactions, disclosure policies, addressing regulatory requests, and implementing compliance efforts. Ocwen admitted in the 2014 Consent Order that it failed to properly maintain adequate systems relating to hundreds of billions of dollars' worth of mortgages. Prior to 2014, the NYDFS identified deficiencies in Ocwen's servicing platform and controls, including (a) robo-signing, (b) inaccurate affidavits and failure to properly validate document execution processes, (c) missing documentation, (d) wrongful foreclosure, (e) failure to properly maintain books and records, and (f) initiation of foreclosure actions without proper legal standing. In addition to Defendant Erbey, Defendants Van Vlack and Lauter also presided over Ocwen during these relevant periods, including Ocwen's servicing operation. Because of their personal participation in Ocwen's deficient internal processes and compliance failures, Defendants knew, or were severely reckless in not knowing, that Ocwen's misconduct would inevitably impact HLSS.

147. *The forced resignation of Defendant Erbey raises an additional inference of scienter*. Despite being a founder of HLSS and contributing personally to its initial capitalization,

regulators highlighted Erbey's conflicted involvement in HLSS and other related companies. Erbey maintained huge stakes in each of the related companies and intentionally provisioned services among and between each company so as to generate extra profits across the servicing industry. Erbey positioned HLSS as an easy way for Ocwen to avoid a growing balance of advances while nominally shifting "servicing" operations to a tax haven. Further, as described in regulatory documents, Erbey designed Ocwen's relationship with Altisource in part so that Ocwen could deem certain mortgagors' coverage ineffective, thereby allowing Altisource to provide the resulting force-placed insurance. Altisource also profited by charging unnecessary mark-ups for services at well-above market rates. Ocwen acted similarly by charging above-market rates to HLSS for its "subservicing" activities, which were so styled in order to facilitate this arrangement. This web of improper relationships, built on the backs of subprime borrowers, was the brainchild of Erbey. Because of his extensive personal involvement in each company throughout the Class Period, Defendant Erbey knew that Ocwen was operating in violation of various agreements, facing further scrutiny, and that it did and would continue to materially impact HLSS.

148. *HLSS was dependent on Ocwen for revenue and internal controls*. Defendants have admitted that HLSS's restated financials were directly due to errors on the part of Ocwen. Yet throughout the Class Period, Defendants were well aware of Ocwen's problematic internal controls, which included accounting and recordkeeping. As regulators pressed Ocwen, including the freeze on the sale of Wells Fargo assets to Ocwen, this would constrict the flow of assets to HLSS, which were needed primarily to be securitized to provide continued funding to HLSS's financing facility. Despite the HLSS Ocwen relationship being – as the New York Times described it – of "mind-aching complexity," Defendants presided, at various times (and in

Erbey's case simultaneously), over both sides of the arrangement and therefore knew the true problems at hand. Defendants attempted to downplay, or in some instances even deny, the facts of this arrangement. The Defendants' degree of personal knowledge of both sides of the arrangement further supports the inference of scienter.

149. *The magnitude and duration of the wrongdoing.* Ocwen's growth was massive and its noncompliance occurred on the same scale. As detailed in the foregoing sections, Ocwen was responsible for backdating thousands of letters to borrowers, which in most cases led to wrongful foreclosures. Ocwen had prolific compliance problems, as Ocwen itself admitted that its systems were ineffective and that it was failing to meet the servicing standards on more than 80% of its private label securities. Ocwen was liable for enormous fines and penalties—including the $150 million it paid to the NYDFS in 2013. The CFPB stated that Ocwen's violations occurred "at every stage" of the servicing process. Finally, Ocwen's servicing business—which was HLSS's only source of business—constituted the fourth largest mortgage servicing operation in the United States. Even after being personally informed, Defendant Erbey and others refused to take action until regulators were threatening Ocwen's ability to do business. All the while, HLSS's investors were presented with a stable image and rosy outlook. The magnitude and duration of Defendants' misstatements further supports the inference of scienter.

150. *The Individual Defendants' personal financial motives.* Defendant Erbey owned 13% of Ocwen's common stock, 26% of Altisource's common stock, 1% of HLSS's common stock. By provisioning services through only related companies and charging mark ups on services that were ultimately passed to borrowers, Erbey personally received massive profits. Further, Defendant Erbey, despite resigning at the behest of the NYDFS, reaped enormous

rewards for doing so: Ocwen paid Erbey a $1.2 million lump sum as part of a "retirement agreement," a $725,000 dividend for his 100 shares of Ocwen Mortgage Servicing's Class A Preferred Stock, as well as a tentative bonus for fiscal year 2014 (of which Erbey only worked 16 days). This is in addition to Erbey's 2,572,626 now-fully vested and exercisable stock options.

151. *The responses of securities analysts and investors further support an inference of scienter*. Numerous analysts voiced concern and some even directly questioned Defendants Erbey and Van Vlack during conference calls. Defendants' false and misleading responses to the analyst questions detailed in the foregoing sections evince an attempt to obscure the extent of the relationship between HLSS and Ocwen. Also documented above, Moody's downgraded HLSS's debt rating citing specifically "the continued regulatory scrutiny of Ocwen." S&P downgraded HLSS "based on the risk that the company's sole subservicer, Ocwen, could lose the right to servicing mortgages in California." Other firms, which include Barclays, Piper Jaffray, and Deutsche Bank have recently downgraded HLSS. Tellingly, Jeffrey Lewis, a senior portfolio manager at TIG Securitized Asset Fund, stated: "There is no question that Bill Erbey is clever, but I am not sure that is such a good thing all of the time." HLSS's own investors eventually questioned its practices, specifically with respect to Ocwen, as one institutional investor pointed out that HLSS was in default on its notes and another even went so far as to nominate new board members unless HLSS dislodged itself from Erbey's control. The response in the marketplace to Defendants materially false and misleading statements further supports an inference of scienter.

## X. LOSS CAUSATION

152. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiffs and the Class. Throughout the Class Period, HLSS's stock price was artificially inflated by Defendants' false and misleading representations and omissions to investors that: (i) Ocwen had adequate servicing capabilities; (ii) no legal or

contingent matters existed that would materially impact HLSS's business or financials; (iii) HLSS maintained adequate internal controls and risk management policies and procedures; (iv) that related-party transactions between HLSS, Ocwen and the Ocwen complex were conducted at arm's-length; and (v) that HLSS's accounting practices and procedures complied with GAAP. The material false and misleading statements and omissions set forth above were widely disseminated to the securities markets, investment analysts, and the investing public. As a result, the market price of HLSS common stock was inflated by the materially false and misleading statements made by HLSS and the Individual Defendants, as identified above, and Lead Plaintiffs and the Class purchased HLSS common stock at artificially inflated prices during the Class Period.

153. The ensuing disclosures on these topics, as described above, revealed to the market on a piecemeal basis the fraudulent nature of these statements and the extent of the misrepresentations issued by the Individual Defendants and contained in HLSS's public filings, press releases, conference call statements and presentations that form the primary basis of this action. When the truth about HLSS was revealed to the market, the price of HLSS common stock declined in response, as the artificial inflation caused by Defendants' material omissions and false and misleading statements was removed from the price of HLSS common stock, thereby causing substantial damage to Lead Plaintiffs and other members of the Class.

154. Indeed, during the Class Period, HLSS common stock traded as high as $25.41 per share on August 1, 2013, and closed at $21.82 on October 20, 2014, the day prior to the NYDFS' October 2014 Letter, when the first partial disclosures were made. Following the release of the October 2014 NYDFS letter, HLSS's stock price fell $2.92 per share, or 13.4%,

from $21.82 per share on October 20, 2014 to $18.90 per share on October 22, 2014—wiping out over $200 million in market capitalization.

155. Over the next several months, in response to several additional partial disclosures that exposed more about the Company's numerous, serious, and pervasive compliance deficiencies, and lack of controls on related party transactions and conflicts of interest, the market reacted, and HLSS's stock price partially corrected as it was significantly driven downward. For instance, following the announcement of the 2014 Consent Order in December 2014, HLSS stock fell by $1.02 per share, or about 5%, from $20.85 per share on Friday, December 19, 2014 to $19.83 per share on Monday, December 22, 2014. Following the announcement of the CDBO's suspension of the Ocwen complex's California operations, HLSS's stock price plummeted $3.14 per share, or 19.5%, on exponentially increased trading volume from $16.09 per share on January 12, 2015 to $12.95 per share on January 13, 2015—wiping out another $220 million in the Company's market capitalization.

156. The Company and the Individual Defendants mitigated the impact of those disclosures and prevented the full truth about HLSS from being revealed by making contemporaneous false and misleading statements that minimized and denied the facts being revealed to the market. As the market finally learned the magnitude of the problems facing the Company and the implications for HLSS's business operations, financial condition and growth prospects, the price of HLSS's stock price plummeted to $13.76 per share on January 23, 2015, the day the CDBO settlement and BlueMountain's first Notice of Default were announced. The truth emerging about the Company's issues caused the market price to fall to $13.76 per share on January 23, 2015 at the end of the Class Period, which represented a decline of $8.06 per share from the Company's $21.82 share price on October 20, 2014, the last day prior to the first partial

disclosure. The Company's stock price continued to decline substantially in the following trading days after the last day of the Class Period, declining an additional $0.69 the following trading day to close at $13.07 on January 26, 2015 on unusually high trading volume, and reaching a low of $12.06 on January 30, 2015. In total, the declines in HLSS's stock prices on the disclosure dates identified erased hundreds of millions of dollars in shareholder market capitalization.

157. It was entirely foreseeable to the Individual Defendants that concealing the Company's widespread conflicts of interest and lack of controls over related party transactions would artificially inflate the price of HLSS common stock. It was similarly foreseeable to the Individual Defendants that revelation of that misconduct, as well as the Company's true operations, financial condition, and prospects, would cause the price of HLSS common stock to drop significantly as the inflation caused by their misstatements and omissions was corrected. Accordingly, the conduct of Erbey, HLSS and the other Individual Defendants, as alleged herein, proximately caused foreseeable damages to Lead Plaintiffs and members of the Class.

## XI. PRESUMPTION OF RELIANCE

158. At all relevant times, the market for HLSS's common stock was efficient for the following reasons, among others:

a) HLSS's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b) As a regulated issuer, HLSS filed periodic reports with the SEC and the NASDAQ;

c) HLSS regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d) HLSS was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public market place.

159. As a result of the foregoing, the market for HLSS's common stock reasonably promptly digested current information regarding HLSS from all publicly available sources and reflected such information in the price of HLSS's common stock. All purchasers of HLSS common stock during the Class Period suffered similar injury through their purchase of HLSS common stock at artificially inflated prices, and a presumption of reliance applies.

160. A Class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

## XII. INAPPLICABILITY OF SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

161. The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint. None of the statements complained of herein was a forward-looking statement. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about the nature of HLSS's business practices, its present financial condition, and its internal controls over financial reporting, among others. Further, the statutory safe harbor does not apply to statements included in financial statements that were prepared purportedly in accordance with GAAP, including HLSS's quarterly reports on Form 10-Q and annual report on Form 10-K issued during the Class Period.

162. To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth above in detail, then-existing facts contradicted Defendants' statements regarding HLSS's relationship with Ocwen and internal controls over financial reporting, among others. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by HLSS were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

163. To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false, and the false forward-looking statement was authorized and approved by an executive officer of HLSS who knew that the statement was false when made.

## XIII. <u>CLASS ACTION ALLEGATIONS</u>

164. Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired the common stock of HLSS between February 28, 2012 and January 22, 2015, inclusive (the "Class"), and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of HLSS at all relevant times, members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

165. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, HLSS shares were actively traded on the NASDAQ. As of December 31, 2014, there were over 71 million shares of HLSS common stock outstanding. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least hundreds-of-thousands of members of the proposed Class. Class members who purchased HLSS common stock may be identified from records maintained by HLSS or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

166. Lead Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as complained of herein.

167. Lead Plaintiffs will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation.

168. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

b) whether the Defendants made statements to the investing public during the Class Period that were false, misleading or omitted material facts;

c) whether Defendants acted with scienter; and

d) the proper way to measure damages.

169. A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrong done to them. There will be no difficulty in the management of this action as a class action.

## XIV. CLAIMS UNDER THE EXCHANGE ACT

### COUNT I

**For Violations Of Section 10(b) Of The Exchange Act**
**And SEC Rule 10b-5 Promulgated Thereunder**
**(Against Defendants HLSS, Erbey, Van Vlack, and Lauter)**

170. Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

171. This Count is asserted on behalf of all members of the Class against Defendants HLSS, Erbey, Van Vlack, and Lauter for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

172. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or they deliberately disregarded as, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

173. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made,

in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of HLSS common stock during the Class Period.

174. Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of HLSS common stock, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiffs and the Class, regarding, among other things, the impact Ocwen's misconduct would have on HLSS, the Company's internal controls, and the Company's financial statements; (b) artificially inflate and maintain the market price of HLSS common stock; and (c) cause Lead Plaintiffs and other members of the Class to purchase HLSS common stock at artificially inflated prices and suffer losses when the true facts became known.

175. Defendants HLSS, Erbey, Van Vlack, and Lauter are liable for all materially false and misleading statements made during the Class Period, as alleged above.

176. As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misrepresentations and omissions of material facts set forth herein, which

presented a danger of misleading buyers or sellers of HLSS stock, were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

177. Lead Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for HLSS common stock, which inflation was removed from its price when the true facts became known. Lead Plaintiffs and the Class would not have purchased HLSS common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' misleading statements.

178. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of HLSS common stock during the Class Period.

## COUNT II

### For Violations Of Section 20(a) Of The Exchange Act (Against Defendants Erbey, Van Vlack, and Lauter)

179. Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

180. This Count is asserted on behalf of all members of the Class against Defendants Erbey, Van Vlack and Lauter for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

181. During their tenures as officers and/or directors of HLSS, each of these Defendants was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act. By reason of their positions of control and authority as officers and/or directors of HLSS, these Defendants had the power and authority to direct the management and activities

of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. These Defendants were able to and did control, directly and indirectly, the content of the public statements made by HLSS during the Class Period, including its materially misleading financial statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

182. In their capacities as senior corporate officers of the Company, and as more fully described above, Defendants Erbey, Van Vlack, and Lauter had direct involvement in the day-to-day operations of the Company, in reviewing and managing its regulatory and legal compliance, and in its accounting and reporting functions. Defendants Van Vlack and Lauter signed the Company's SEC filings during the Class Period, and were directly involved in providing false information and certifying and approving the false statements disseminated by HLSS during the Class Period. Defendants Van Vlack and Lauter were also directly responsible for controlling, and did control, the Company's violations of GAAP and other relevant accounting rules, and were directly involved in providing false information and certifying and approving the false statements disseminated by HLSS during the Class Period. As a result of the foregoing, Defendants Erbey, Van Vlack, and Lauter, as a group and individually, were controlling persons of HLSS within the meaning of Section 20(a) of the Exchange Act.

183. As set forth above, HLSS violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of HLSS and as a result of their own aforementioned conduct, Defendants Erbey, Van Vlack, and Lauter are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and the other members of the Class who

purchased or otherwise acquired HLSS securities. Moreover, as detailed above, during the respective times these Defendants served as officers and/or directors of HLSS, each of these Defendants culpably participated in the material misstatements and omissions made by HLSS.

184. As a direct and proximate result of these Defendants' conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of HLSS common stock.

## XV. PRAYER FOR RELIEF

185. WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

a) Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b) Awarding all damages and other remedies available under the Securities Exchange Act in favor of Lead Plaintiffs and all members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

c) Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d) Such other and further relief as the Court may deem just and proper.

## XVI. JURY DEMAND

186. Lead Plaintiffs hereby demand a trial by jury.

Dated: July 17, 2015

**LAW OFFICES OF CURTIS V. TRINKO, LLP**

By: */s/Curtis V. Trinko*
Curtis V. Trinko (CT-1838)
Jennifer Traystman (JT-7583)
C. William Margrabe (CM-7734)
16 West 46th Street, 7th Floor
New York, NY 10036
Tel: (212) 490-9550
Fax: (212) 986-0158
Email: Ctrinko@trinko.com

*Liaison Counsel for Lead Plaintiffs*

**SAXENA WHITE P.A.**
Joseph E. White III (JW-9598)
Lester R. Hooker
Brandon T. Grzandziel
5200 Town Center Circle, Suite 601
Boca Raton, FL 33486
Tel: (561) 394-3399
Fax: (561) 394-3382

*Lead Counsel for Lead Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 17, 2015, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system. This system will send electronic notice of filing to all counsel of record by operation of the Court's electronic filing system.

I certify under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on July 17, 2015.

*/s/ Curtis V. Trinko*
Curtis V. Trinko